Donald KNOX, et al.

v.

Richard A. LANHAM, Sr., et al.

No. JFM–93–1891.

United States District Court, D. Maryland.

July 31, 1995.

---

Frances Elizabeth Kessler, Baltimore, MD, for plaintiffs.

Wallace Ward, pro se.

Charles Hatfield, pro se.

John Lee Worsham, pro se.

Stephanie Judith Lane–Weber, Baltimore, MD, for defendants.

## MEMORANDUM

MOTZ, Chief Judge.

Plaintiffs are prisoners committed to the custody of the Maryland Commissioner of Correction ("Commissioner") who are serving life sentences with the possibility of parole.[1] Prior to 1993, plaintiffs were classified

---

1. There are eight named plaintiffs in Civil No. JFM–93–1891. (The lead plaintiff, Donald Knox, has recently died.) These plaintiffs are represented by The Legal Aid Bureau. A number of other cases originally brought *pro se* by similarly situated inmates have been consolidated with Civil No. JFM–93–1891. In some of these cases the plaintiffs have now accepted representation by The Legal Aid Bureau; in others they have not. Although the plaintiffs who are representing themselves were not permitted to participate in the oral argument on the pending motions, I have considered their written submissions in arriving at my decision.

to minimum or pre-release security (the two lowest levels), and several participated in work release and/or family leave programs. In the spring of 1993, participation in family leave and work release programs by prisoners serving life sentences was suspended. Further, plaintiffs were reclassified to at least medium security.

Plaintiffs have filed suit under 42 U.S.C. § 1983 on behalf of themselves and other inmates who are similarly situated.[2] They assert claims based on violations of the Ex Post Facto Clause, the Equal Protection Clause, the Due Process Clause, and the Eighth Amendment. Defendants are various state corrections officials and parole commissioners. Plaintiffs seek injunctive, declaratory, and monetary relief. Discovery has been completed and defendants have moved to dismiss the complaint or, in the alternative, for summary judgment. Plaintiffs have also filed a motion for partial summary judgment.

## I.

### A.

As of June 1, 1993, plaintiffs were classified to minimum or pre-release security levels.[3] Some were on active work release and had participated in family leaves. On April 28, 1993, the Commissioner suspended lifer participation in the family leave program. On June 2, 1993, the Commissioner removed all inmates serving a life sentence no portion of which had been suspended from the pre-release system, returned all such inmates to a medium security facility, and upon arrival at a medium security facility placed them briefly in administrative segregation.[4] On June 7, 1993 and June 9, 1993, the Commissioner and his deputy reclassified all lifers in the Division of Correction to at least medium security.

The Commissioner states that he transferred and reclassified plaintiffs following four incidents involving lifers on work release that jeopardized public safety. On December 27, 1993, the Deputy Commissioner issued a memorandum clarifying that the prohibition against classifying lifers below medium security was still in effect, but that with the approval of the Commissioner or his deputy, the prohibition would not apply to those serving life with all but a portion of their sentences suspended. Most recently, the Commissioner promulgated an amendment to the Maryland Division of Correction Directive 100–1 ("DCD 100–1") governing classification of inmates effective December 1, 1994. This amendment, Change Notice 35–94, stated: "An inmate with a life sentence, except an inmate sentenced to life with all but a portion suspended, shall not be reduced below medium security." These series of actions by the Commissioner[5] are one focus of plaintiffs' challenge: namely the lifers' removal from pre-release programs and facilities and their permanent classification to at least medium security.

A second focus of plaintiffs' amended complaint, particularly for their ex post facto challenge, is their allegation that the Maryland Parole Commission requires active work

2. Plaintiffs have requested class certification under Fed.R.Civ.P. 23. The class sought to be certified is composed of inmates in the Maryland prison system serving parolable life sentences no portion of which has been suspended who, as of June 1, 1993, were classified to minimum or pre-release security. Defendants do not oppose class certification insofar as plaintiffs seek injunctive and declaratory relief. Likewise, although defendants oppose class certification as to individual claims for monetary relief, they do so only "in the event liability is established." Since I am holding that defendants are protected from monetary liability on the ground of qualified immunity (a ruling that applies to all inmates situated similarly to plaintiffs), I will grant plaintiffs' motion for class certification as to all of their claims.

3. The Division of Correction classifies inmates in five categories: super maximum, maximum, medium, minimum, and pre-release. A prisoner usually progresses down one level at a time, and cannot participate in work release or family leave programs unless she is classified to pre-release security.

4. Inmates can be placed in a facility with a greater security designation than their classification (e.g., pre-release inmates can be placed in a medium security prison), but they cannot be placed in a lower security facility. Md. Dept. of Correction Directive 100–1, § V.D.

5. These actions also implicate the Deputy Commissioner and the Commissioner's superiors, all of whom are named defendants.

release for plaintiffs before it will recommend parole. To attain parole, an inmate sentenced to a life sentence in Maryland must be recommended for parole by the Parole Commission, and then be approved by the Governor. Md.Ann.Code art. 41, § 4–504(b)(3). Plaintiffs point to Parole Commission practices, such as recent hearings at which participation in work release is required before a parole recommendation will be made, to establish that the unwritten requirement exists.

Plaintiffs cite scores of Parole Commission admonitions to plaintiffs over the past few decades that they must progress to lower security classifications and spend time on work release before the Commission would consider making a parole recommendation. For example, one member of the plaintiff class, Eugene Allen, was advised by the Parole Commission in 1985 that "he must begin to move through the System, advancing to lesser security and ultimately gaining a minimum of 2 years on work release if his case is ever to reach the full Commission for possible submission to the Governor's Office." Further, this "unwritten requirement" is allegedly still in force despite the change in the Division of Correction policy that absolutely prevents a life inmate from progressing to lower security or spending time on work release. For example, in just the first two months of 1995, the Parole Commission denied parole recommendations to five plaintiffs with the express direction that they progress to lesser security and work release. In the same time period, the Parole Commission denied parole recommendations to five other plaintiffs in order to wait for "resolution of the lifer policy," even though the Commissioner of Corrections had issued his final Change Notice 35–94 effective December 1, 1994. Plaintiffs claim that this unwritten Parole Commission requirement of the now unattainable lower security classification and time on work release effectively denies them any possibility of parole.

### B.

Plaintiffs' Amended Complaint contains seven counts. Counts 1 and 3 allege violations of procedural due process in the Com-

missioner's removal of plaintiffs from the family leave program (Count 1) and his removal of them from pre-release facilities, his removal of them from the work release program, and his increasing their security level (Count 3). Counts 2 and 4 allege violations of equal protection in the Commissioner's removal of plaintiffs from the family leave program (Count 2) and his removal of them from pre-release facilities, his removal of them from the work release program, and his increasing their security level (Count 4).

Count 5 alleges a violation of the Ex Post Facto Clause in the Commissioner's removal of plaintiffs from work release, family leave, and pre-release facilities and his permanently increasing their security level. Count 5 also alleges a violation of the Ex Post Facto Clause in the Parole Commission's refusal to recommend plaintiffs for parole until they are classified to lower security status and participate in work release and family leave programs.

Count 6 alleges that the actions of the Commissioner and the Parole Commission each constitute mental torture in violation of the Eighth and Fourteenth Amendments' prohibition of cruel and unusual punishment. Count 7 alleges that the plaintiffs' placement on administrative segregation upon being transferred to medium security facilities violated their right to substantive due process under the Fourteenth Amendment.

### II.

Article 1 of the Constitution of the United States provides that "No State shall ... pass any ... ex post facto Law." U.S. Const. art. I, § 10, cl. 1. Ex post facto laws include, among others, " '[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.' " *Miller v. Florida*, 482 U.S. 423, 429, 107 S.Ct. 2446, 2450, 96 L.Ed.2d 351 (1987) (quoting *Calder v. Bull*, 3 Dall. 386, 390, 1 L.Ed. 648 (1798)). Plaintiffs contend that the Commissioner's removal of them to higher security and the Parole Commission's refusal to recommend parole unless plaintiffs are on active work release (which requires a lower security classification) are ex post facto laws that retroactively inflict

greater punishment on them by effectively denying them parole.

A similar case raising an ex post facto challenge to an earlier version of Maryland's DCD 100–1 (then called DCR 100–1) was litigated recently in front of Judge Kaufman. *Faruq v. Herndon,* 831 F.Supp. 1262 (D.Md. 1993). There, the plaintiffs were two classes of inmates [6] challenging changes to DCR 100–1 that allegedly slowed their progression to lower security levels and thus made it more difficult to attain parole. *Id.* at 1265. First, Judge Kaufman ruled that the then-existing DCR 100–1 was not a "law" because while it was promulgated pursuant to delegated legislative authority, the regulation was "being exercised in a discretionary way." *Id.* at 1280. Second, Judge Kaufman held that even if DCR 100–1 could be considered a "law," there was no ex post facto violation. Judge Kaufman found that to establish that plaintiffs were disadvantaged by DCR 100–1 required "showing a causal nexus between classification security level and release on parole." *Id.* at 1281. Judge Kaufman found that the evidence established that parole was granted in an individualized manner and that the Parole Commission did not have an unwritten policy requiring time at a lower security level before being granted or recommended for parole. Judge Kaufman therefore ruled that plaintiffs had failed to establish the "appropriate nexus between security classification and release on parole" and that they were "disadvantaged sufficiently" by the then-existing DCR 100–1 to prevail on their ex post facto attack on the regulation. *Id.* at 1282.

The material facts in *Faruq* are quite similar to those in the instant case, and Judge Kaufman's analysis is applicable and instructive. However, DCR 100–1 has been changed again, and its constitutionality must be considered anew. The conventional approach of analysis requires that I make two inquiries in answering this question. First, I must determine whether the policies challenged by the plaintiffs are "laws" under the Ex Post Facto Clause. Second, I must decide whether, if they are such "laws," they constitute retroactive punishment against plaintiffs.[7]

A.

■ The Constitution prohibits ex post facto "laws." Thus, the first question before me is whether the policies challenged by plaintiffs are "laws" for purposes of the Ex Post Facto Clause. The legal landscape of this issue is aptly set out in *United States v. Ellen,* 961 F.2d 462, 465 (4th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 217, 121 L.Ed.2d 155 (1992):

As the text of the Clause makes clear, the ex post facto prohibition applies only to "laws." Accordingly, "[t]he constitutional prohibition against ex post facto laws ... is directed to the legislative branch of government rather than to the other branches." *Prater v. United States Parole Comm'n,* 802 F.2d 948, 951 (7th Cir.1986) (*en banc*). This is not to say, however, that all actions of administrative agencies are exempt from Ex Post Facto Clause scrutiny. "When Congress has delegated to an agency the authority to make a rule instead of making the rule itself, the resulting administrative rule is an extension of the statute for purposes of the [C]lause." *Rodriguez v. United States Parole Comm'n,* 594 F.2d 170, 173 (7th Cir. 1979).... But when an agency promulgates an interpretive rule, the Ex Post Facto Clause is inapplicable.... Unlike legislative rules, which "ha[ve] the force of law," [*Jerri's Ceramic Arts, Inc. v. Consumer Product Safety Comm'n,* 874 F.2d 205, 207 (4th Cir.1989) ], interpretive rules "are statements of enforcement policy. They are ... 'merely guides, and not laws:

---

**6.** One class consisted of "all inmates in the custody of the DOC serving life sentences for offenses committed before January 18, 1988 for whom DCR 100–1 (January 18, 1988) made it more difficult to progress to lower security and work release and therefore more difficult to attain parole." *Id.* at 1265. The other class consisted of similarly situated non-life inmates. *Id.*

**7.** The two-step approach that I have taken has become the conventional one. I note, however that the recent opinion of the Supreme Court in *California Dept. of Corrections v. Morales,* —— U.S. ——, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995), which I discuss in Section IIB *infra,* suggests that a more straightforward, less formalistic analysis may be appropriate.

guides may be discarded where circumstances require; laws may not.'" *Prater*, 802 F.2d at 954 (quoting *Inglese v. United States Parole Comm'n*, 768 F.2d 932, 936 (7th Cir.1985)).

In short, whether the challenged policies are "laws" depends on whether they are legislative rules or merely interpretive guides. *Ellen*, 961 F.2d at 466.

Viewed from this perspective, the new DCD 100–1 is a "law" for purposes of the Ex Post Facto Clause. First, it is a rule promulgated pursuant to legislatively delegated authority. The Commissioner of the Division of Correction has been delegated the authority to "adopt and promulgate reasonable rules and regulations for the operation and maintenance of the several institutions and agencies in the Division." Md.Ann.Code art. 27, § 676. Second, the rule is not merely a guide that leaves discretion with classification teams, wardens, or the Parole Commission, in the security classification of lifers. The new DCD 100–1 may not be "discarded where circumstances require," but is an inflexible rule that a lifer "shall not be reduced below medium security." This inflexibility differentiates the new DCD 100–1 from the regulation examined in *Faruq*.

■ Although the question is a closer one, I also find that the unwritten policy of the Parole Commission requiring plaintiffs to be on active work release and family leaves before receiving a parole recommendation constitutes a "law" for ex post facto purposes. It is true that under Maryland law the Parole Commission may adopt regulations governing the policies and activities of the Commission only after obtaining the approval of the Secretary of Public Safety and Correctional Services and only pursuant to the Maryland Administrative Procedure Act. The Commission has done neither in adopting the policy here in question. However, it would be odd indeed if a state could avoid the constitutional ban against ex post facto enactments merely by arguing that one of its agencies has circumvented state law. The summary judgment record establishes beyond dispute that the new policy has, at least de facto, become written in stone. The state has not disavowed it and by no stretch of the

imagination could it be deemed to be solely "interpretative" rather than an exercise of legislative judgment.

Similarly, the summary judgment record establishes that the policy is entirely inflexible in its operation. Although in theory parole commissioners may retain the discretion not to require lifers to be on active work release and family leave before receiving a parole recommendation, if the Commissioners are to be believed, they cannot exercise their discretion to do so—at least until the issues raised in this litigation have been resolved.

■ Law is not sophistry; constitutional mandates cannot be avoided and individual rights violated by exalting form over substance. Because of its inflexibility, the Parole Commission's parole recommendation policy suffers from precisely the same defect as the new DCD 100–1 and is therefore a law for ex post facto purposes.

### B.

■ The Ex Post Facto Clause prohibits laws that are "penal statutes which disadvantage the offender affected by them." *Collins v. Youngblood*, 497 U.S. 37, 41, 110 S.Ct. 2715, 2718, 111 L.Ed.2d 30 (1990). As the Fourth Circuit has noted, "a statute that is not penal cannot be *ex post facto*." *Jones v. Murray*, 962 F.2d 302, 309 (4th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 472, 121 L.Ed.2d 378 (1992) (upholding Virginia statute requiring imprisoned felons to submit blood samples). The critical question is whether the law in question "retroactively alter[s] the definition of crimes or increase[s] the punishment for criminal acts." *Collins*, 497 U.S. at 43, 110 S.Ct. at 2719 (citing *Calder v. Bull*, 3 Dall. 386, 391–92, 1 L.Ed. 648 (1798)).

Plaintiffs do not seem to argue that their change in security classification alone violates the Ex Post Facto Clause. A number of cases have held that security classification decisions concern "internal administration of a prison," and are not punitive such as to violate the Ex Post Facto Clause. *See, e.g., Dyke v. Meachum*, 785 F.2d 267 (10th Cir. 1986) (upholding change in state policy re-

quiring prisoners to serve twenty percent, rather than ten percent, of sentence prior to eligibility for reclassification to minimum security status since policy was itself merely an internal prison regulation); *Payton v. Fiedler,* 860 F.Supp. 606, 609 (E.D.Wis.1994) (concluding that "security classifications are not a component of punishment for purposes of the ex post facto clause"). There is no allegation or evidence that the Division of Correction intends DCD 100–1 to be punitive. *See Payton,* 860 F.Supp. at 609. The record establishes that the reclassification was prompted by a number of unfortunate incidents involving lifers.

Plaintiffs, instead, rely upon the combination of the mandatory security classification and the Parole Commission's alleged unwritten requirement of work release to challenge their being denied parole. Plaintiffs argue that the challenged policies, working together, effectively deny them a "meaningful opportunity for parole." The Supreme Court's recent decision in *California Dept. of Corrections v. Morales,* ——— U.S. ———, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995) establishes the framework to evaluate plaintiff's alleged increase in punishment.

In *Morales* petitioner challenged a 1981 amendment to California's parole regulations that changed the mandated time in which a parole suitability hearing had to be conducted from once every year to once every three years. The Court found that the 1981 amendment did not violate the Ex Post Facto Clause. Therefore, at first blush it would appear that *Morales* supports the position taken by respondents in this case; upon closer analysis, however, it is evident that the converse is true.

In upholding the 1981 amendment, the Court focused upon the question of whether the amendment would have any substantial, practical impact upon the length of prisoners' period of confinement. The Court rejected an approach to the Ex Post Facto Clause that "would require that we invalidate any of a number of minor (and perhaps inevitable) mechanical changes that might produce some remote risk of impact on a prisoner's expected term of confinement." *Id.* at ——— – ———, 115 S.Ct. at 1602–03. The Court then listed

a number of minor procedural adjustments to parole and sentencing procedures in which an expansive reading of the Ex Post Facto Clause would require courts to intervene. Appropriately expressing concern about judicial "micro-management" of the parole and sentencing process, the Court rejected the view that ex post facto violations are caused by procedural changes that "might create some speculative, attenuated risk of affecting a prisoner's actual term of confinement by making it more difficult for him to make a persuasive case for early release." Declining to establish any litmus test, the Court distilled its precedents to the principle that "the question of what legislative adjustments 'will be held to be of sufficient moment to transgress the constitutional prohibition' must be a matter of 'degree.'" *Id.* at ———, 115 S.Ct. at 1603 (quoting from *Beazell v. Ohio,* 269 U.S. 167, 171, 46 S.Ct. 68, 69, 70 L.Ed. 216 (1925)). The ultimate issue as framed by the Court is whether a challenged action "produces a sufficient risk of increasing the measure of punishment attached to the covered crimes" to warrant invalidation under the Ex Post Facto Clause. *Morales,* ——— U.S. at ———, 115 S.Ct. at 1603.

In *Morales* the Court easily concluded that the amendment in question was not unconstitutional. All that the amendment did was to "introduce the possibility that after the initial parole hearing, the Board would not have to hold another hearing the very next year, or the year after that, if it found no reasonable probability that ... [a prisoner] would be deemed suitable for parole in the interim period." *Id.* at ———, 115 S.Ct. at 1602. The purpose of the amendment was to eliminate useless and unnecessary hearings, thereby "reliev[ing] the [Board] from the costly and time-consuming responsibility of scheduling parole hearings' for prisoners who have no reasonable chance of being released." *Id.* (citation omitted). The amendment did no more than "allow[ ] the Board to avoid the futility of going through the motions of reannouncing its denial of parole suitability on a yearly basis." *Id.* at ———, 115 S.Ct. at 1604. In short, the Court found that the 1981 amendment "creates only the most speculative and attenuated risk of increasing the

measure of punishment attached to the covered crimes." *Id.* at ——, 115 S.Ct. at 1605.

In contrast, an honest reading of the summary judgment record in this case leads to the conclusion that the effect of the interaction between the mandatory medium security classification and the Parole Commission's unwritten requirement of work release and family leave before recommending parole, far from creating a "speculative and attenuated risk of increasing the measure of punishment attached to" plaintiffs' crimes, directly impacts upon their actual eligibility for parole.

It may well be, as respondents argue, that "lifers" are only rarely granted parole. However, prior to the adoption of the measures here in question, that rare opportunity did exist for lifers who displayed an exceptional attitude and who compiled an excellent record while incarcerated. That opportunity has now been taken from them. The record establishes beyond dispute that (1) under current Parole Commission policy prisoners will not be recommended for parole unless they are on work release, (2) prisoners cannot participate in work release unless they are classified to pre-release security and (3) under DCD 100–1 lifers cannot be granted pre-release security. The effect of these changes is to foreclose lifers from ever being able to obtain parole. Hope and the longing for reward for one's efforts lie at the heart of the human condition. Their destruction is punishment in the most profound sense of the word. Accordingly, I find that the combined effect of the new DCD 100–1 and the Parole Commissioner's proven policy constitutes a violation of the Ex Post Facto Clause.

### III.

In light of my finding that an ex post facto violation has been committed, consideration of plaintiffs' remaining claims may be somewhat academic. However, potential remedies and the public's interest in the efficient administration of justice (in the event that my ruling on the ex post facto question is reversed on appeal) dictate that I address those claims.

### A.

■ Plaintiffs argue that their removal from the family leave and work release programs and their classification to higher security levels constituted a deprivation of liberty without due process of law in violation of the Fourteenth Amendment. Am.Compl. paras. 44, 46 (Counts 1, 3). They assert that Maryland created a protected liberty interest in retaining acquired security classification and/or work release status by its statutes, regulations, past practices, and work release agreements that placed substantive limitations on official discretion to classify prisoners like plaintiffs.

To establish a liberty interest, plaintiffs rely on a line of cases in which, over the past two decades, the Supreme Court and the lower courts have focused on whether the state action was discretionary or mandatory. Were this mode of analysis still appropriate, defendants' motion to dismiss would be granted under the clear authority of *Paoli v. Lally,* 812 F.2d 1489, 1492 (4th Cir.), *cert. denied,* 484 U.S. 864, 108 S.Ct. 184, 98 L.Ed.2d 137 (1987). *Paoli* examined nearly identical Maryland statutes and regulations as those at issue here and held that the Maryland Commissioner of Correction has complete discretion over the security classification of inmates and their participation in work release and family leave programs.

However, the Supreme Court has recently modified the method of analysis to be applied in the prison context to determine whether a prisoner has a protected liberty interest. In *Sandin v. Conner,* —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), a prisoner was refused the right to call witnesses at a disciplinary proceeding at which he was found guilty and punished by placement in disciplinary segregation for 30 days. The prisoner sought to establish his liberty interest in remaining in the general prison population by pointing to prison regulations that allowed placement in disciplinary segregation only upon a finding of guilt. The Ninth Circuit found that the prison regulations, through their mandatory language, created a protected liberty interest and therefore required compliance with procedural due process, in-

cluding the right to call witnesses at the disciplinary hearing.

The Supreme Court expressly rejected the analytical approach that searched for a liberty interest based on negative implications from mandatory language in prison regulations. The Court noted that focusing on mandatory terms in prison regulations "creates disincentives for States to codify prison management procedures" and leads "to the involvement of federal courts in the day-to-day management of prisons." *Id.* at ——, 115 S.Ct. at 2299. Rather, the Court sought to refocus attention on the "nature of the deprivation." *Id.* Under the standard announced in *Sandin,* a state creates a liberty interest when it "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at ——, 115 S.Ct. at 2300. The Court concluded that Conner's placement in disciplinary segregation was not "a dramatic departure from the basic condition of ... [his] indeterminate sentence," or "a major disruption in his environment" since prison officials had discretion to place prisoners in administrative segregation and prisoners were faced with significant amounts of "lockdown time" even in the general population. *Id.*

Unfortunately, the application of this new standard to the instant case is far from clear.[8] To a large extent the analysis would appear to turn on whether the "ordinary incidents of prison life" are viewed from an objective or subjective perspective. In general, it is not atypical for life inmates to be placed at or above medium security. However, the particular life inmates who compose the plaintiff class were by definition in minimum or pre-release security, and many of them were actively participating in work release and family leave programs. Their removal from such programs and placement in medium security facilities certainly imposed atypical and significant hardship on them relative to their ordinary prison life immediately before the new directive, and was undeniably a "major disruption" in their environments.

I am inclined to believe that the Fourth Circuit, following *Sandin,* would hold that plaintiffs did not have a protected liberty interest in remaining in their classifications. I need not decide that issue, however, since assuming that plaintiffs did have such interest, they received all the process that they were due when the Commissioner ordered them classified to medium security and transferred them to medium security facilities pursuant to his legislatively delegated authority. *See* Md.Ann.Code art. 27, § 676, 690(b). As the Supreme Court has noted:

The Constitution does not grant to members of the public generally a right to be heard by public bodies making decisions of policy. In *Bi–Metallic Investment Co. v. State Board of Equalization,* 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915), this Court rejected a claim to such a right founded on the Due Process Clause of the Fourteenth Amendment. Speaking for the Court, Justice Holmes explained:

"Where a rule of conduct applies to more than a few people it is impracticable that every one should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town meeting or an assembly of the whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule." *Id.* at 445, 36 S.Ct., at 142.

*Minnesota State Bd. for Community Colleges v. Knight,* 465 U.S. 271, 283–284, 104 S.Ct. 1058, 1065–1066, 79 L.Ed.2d 299 (1984).

In *Bi–Metallic* the Court had upheld a generally applicable tax increase against a due process challenge by individuals whose tax would be increased under the new law. The same rule that individuals have no right to a hearing because of a deprivation of a protected interest by virtue of a law of general application has been extended to legisla-

---

**8.** Justice Ginsburg, in dissent, notes that the majority opinion "leave[s] consumers of the Court's

work at sea." *Id.* at —— n. 2, 115 S.Ct. at 2303 n. 2.

tive rules promulgated by administrative agencies, such as the Maryland Division of Correction. *See generally,* John E. Nowak & Ronald D. Rotunda, *Constitutional Law* 526 (1991) ("When an agency promulgates generalized rules there is no constitutional right to a hearing for a specific individual."); Laurence H. Tribe, *American Constitutional Law,* 682–83 (1988) ("Substantively constitutional regulations ... taking the form of mechanically applied general eligibility standards ... have not ordinarily triggered any requirement that procedural due process be accorded to each affected person individually."). I have already found in discussing the Ex Post Facto Clause issue that the new DCD 100–1 is a legislative rule, and if the rule is otherwise constitutional (i.e., it does not violate the Ex Post Facto Clause, the Equal Protection Clause or the Eighth Amendment), the fact that it was properly promulgated provides all the process due.

Indeed, any further process for individual plaintiffs would be a meaningless waste of public resources and of plaintiffs' own energies and time. The Commissioner does not dispute the fact that plaintiffs acted properly while in lower security classifications and on work release. He reclassified plaintiffs not because of misconduct but because of general public safety considerations. Thus, notice and individualized hearings would serve no useful purpose. *Cf. Richardson v. Town of Eastover,* 922 F.2d 1152 (4th Cir.1991).

### B.

■ Plaintiffs next challenge their removal from family leave and work release programs, their transfer from pre-release facilities, and their increased security levels as a violation of the Equal Protection Clause of the Fourteenth Amendment. Am. Compl. paras. 45, 47 (Counts 2 and 4). Plaintiffs argue that treating them differently from other inmates, even those serving life sentences with all but a portion suspended, has no rational justification and thus violates their right to equal protection under the law. The parties agree that there is no equal protection violation if "the challenged distinction rationally furthers some legitimate, articulated state purpose." *McGinnis v. Roy-*

*ster,* 410 U.S. 263, 270, 93 S.Ct. 1055, 1059, 35 L.Ed.2d 282 (1973). The record demonstrates that the distinctions made for plaintiffs are indeed rationally related to a legitimate state interest.

Plaintiffs were initially removed from the family leave and work release programs to allow for a review of participation in the programs after a number of untoward incidents had occurred. Plaintiffs contend that such a review should not have been undertaken since "future behavior of any of the Plaintiffs can[not] be predicted by the actions of other prisoners." Further, they argue that singling out lifers was irrational because nonlifers have a higher rate of recidivism and only three of the four incidents involved lifers.

Defendants have not expressly articulated the reasons given for the amendment to DCD 100–1 that permanently classifies all lifers at or above medium security. However, legitimate reasons involving significant state interests can be gleaned from the justifications given for the lifers' initial removal from work release and family leave programs. Commissioner Lanham states that a number of escapes combined with the rarity of lifers actually attaining parole led him to conclude that lifers on work release and family leave were escape risks. Lanham Aff., Def. Mem. Ex. 1, para. 6. Prevention of inmate escape is a legitimate state interest. Further, it is reasonable to conclude that the escape risk of plaintiffs (who, without attaining parole, will never be released from prison) is greater than that of other inmates including those sentenced to life with all but a portion suspended (who, even if denied parole, will definitely be released at some point).

Finally, the distinction between plaintiffs and all other inmates (including those sentenced to life with all but a portion suspended) is justified by the generally more serious nature of crimes. *McQuillion v. Rushen,* 639 F.Supp. 420, 424 (N.D.Cal.1986).

### C.

■ Plaintiffs also allege that the Commissioner's refusal to lower their security classification, and the Parole Commission's

refusal to recommend parole without lower security classification, each with knowledge of the other, amount to "mental torture in violation of the Eighth and Fourteenth Amendments' prohibition on cruel and unusual punishment." Am.Compl. paras. 50, 51 (Count 6).

■ The Eighth Amendment prohibits punishments that involve the unnecessary and wanton infliction of pain or that are grossly out of proportion to the severity of the crime, including actions that are totally without penological justification. *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981) (citations omitted). The Eighth Amendment draws its meaning "from the evolving standards of decency that mark the progress of a maturing society." *Id.* Assuming that the policies challenged here constitute punishment for Eighth Amendment purposes, they are not "so totally without penological justification that [they] result in the gratuitous infliction of suffering." *Gregg v. Georgia*, 428 U.S. 153, 183, 96 S.Ct. 2909, 2929, 49 L.Ed.2d 859 (1976). Neither this court's own judgment nor any objective factor, *see Rhodes*, 452 U.S. at 346, 101 S.Ct. at 2399, suggests that the decision of the Commissioner to increase plaintiffs' security levels and the decision of the Parole Commission to decline to recommend parole offend contemporary standards of decency.

### D.

■ Finally, plaintiffs challenge their temporary placement on administrative segregation following their removal to medium security facilities on substantive due process grounds. Am.Compl. para. 52 (Count 7). This claim fails for the simple reason that plaintiffs have identified no fundamental constitutional right that was violated by their temporary placement on administrative segregation.

### IV.

■ The last issue to be decided is whether defendants are entitled to qualified immunity as to plaintiffs' claim for monetary damages. In general, public officials are free from personal liability for damages if they establish that their conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). To be held liable, the defendants must know that they were violating the Ex Post Facto Clause by their conduct. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *Gooden v. Howard County, Md.*, 954 F.2d 960 (4th Cir.1992).

In this case, only the combination of different defendants' conduct violated the Ex Post Facto Clause. Plaintiffs conceded at oral argument that the actions of defendants, considered independently of one another, were reasonable and did not violate the Ex Post Facto Clause. The conduct of those who approved the regulations reclassifying plaintiffs to medium security was reasonable because of public safety concerns. Likewise, the conduct of the Parole Commissioners was reasonable because of the desire to evaluate a prisoner's likely adjustment to parole through his participation in work release programs. Only when the two actions are combined does an ex post facto violation result because of the effective denial of parole to plaintiffs.

Moreover, a violation of the Ex Post Facto Clause is found to exist only after a fairly complex analysis of this less than commonly invoked constitutional provision. Even if some defendants could be charged with knowing the practical effect of their combined actions, it is unfathomable that a reasonable official, a lay person primarily concerned with effectively fulfilling her normal duties, would see the combination of the two actions as a violation of plaintiffs' "clearly established" ex post facto rights. Furthermore, plaintiffs' argument gains significant support from *Morales*, a Supreme Court case decided only after this Court began consideration of this motion. Accordingly, defendants are entitled to summary judgment on plaintiffs' claims for monetary damages.

A separate order effecting the rulings made in this memorandum is being entered herewith.

## ORDER

For the reasons stated in the memorandum entered herewith, it is, this *31st* day of July, 1995,

ORDERED:

1. Plaintiffs' request for class certification is granted, and the relief granted in favor of plaintiffs in paragraph 2 of this order and the judgment entered against them in paragraph 3 of this order are declared to be applicable to all inmates in the Maryland prison system serving parolable life sentences no portion of which has been suspended who, as of June 1, 1993, were classified to minimum or prerelease security;

2. As long as the Maryland Division of Correction mandates that plaintiffs cannot be classified below medium security and as long as no inmate classified in medium security or higher is permitted to participate in work release and family leave programs, no Maryland Parole Commissioner may require as a condition for recommending the parole of any inmate who falls within the plaintiff class that he or she be actively participating in a work release or family leave program; and

3. Judgment is entered in favor of defendants against plaintiffs (on the ground of qualified immunity) as to the claims for monetary relief asserted by plaintiffs.