*Chandler v. Pallito*, No. 210-4-13 Wncv (Tomasi, J., Dec. 24, 2015)
[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT

| SUPERIOR COURT | CIVIL DIVISION |
| Washington Unit | Docket No. 210-4-13 Wncv |

Dennis Chandler,
    Plaintiff

v.

Andrew Pallito,
    Defendant

Opinion And Order On
Cross-Motions For Summary Judgment

Plaintiff Dennis Chandler filed this habeas corpus action claiming a violation of the Ex Post Facto Clause of the United States Constitution, U.S. Const. art. I, § 10. He claims that statutory amendments and changes in the Department of Corrections' (DOC's) decision-making or policies occurring after the offenses that led to his incarceration have left him effectively ineligible for parole. He asserts that, but for those changes, he would be eligible for parole. Mr. Chandler and the State have filed cross-motions for summary judgment. The Court makes the following determinations.

1.     <u>Claims</u>

Mr. Chandler pled guilty to aggravated sexual assault, kidnapping, and burglary and was sentenced in April 1997 to 25 to 60 years. He has been incarcerated ever since. He alleges that, at the time of sentencing, the DOC had the goal of making programming and other decisions related to him so that he would be

ready for parole at his minimum term.[1]  He asserts that DOC later changed its goal

for him.  Rather than having him on a track that might lead to release at his

minimum, it now has him on a track that anticipates parole at some later point.

In further support of his ex post facto claim Mr. Chandler cites to numerous

administrative and legislative changes that have allegedly occurred since his

conviction.  He contends that the political climate, nationally and in Vermont, with

regard to "truth in sentencing" and violent or sexual offenders has become much

harsher over the years.  In 2002, the Legislature required the DOC to adopt a

"reintegration process" and required the DOC to make a recommendation to the

Parole Board regarding suitability for parole after an offender convicted of a "listed

crime" had "completed 180 days of supervision in a conditional reentry program."

28 V.S.A. § 725(2).  The Parole Board, he asserts, has become highly reluctant to

grant parole unless an offender is successful with furlough.[2]

---

[1] Mr. Chandler's position is not so much that he necessarily would have been
paroled at his minimum, but that he would have been given what institutional
opportunities were available so he could posture himself as a good candidate for
parole by his minimum.

[2] Mr. Chandler also notes that, in 2004, the legislature adopted a mechanism by
which the DOC could designate a sex offender as "high risk" for purposes of the sex
offender registry.  In 2009, it adopted 28 V.S.A. § 204b, which requires all such
"high risk" offenders to serve at least 70% of their maximum terms (the 70% rule).
At one point in the past, the DOC determined that Mr. Chandler was "high risk"
and subjected him to the 70% rule, pursuant to 28 V.S.A. § 204b.  This Court,
however, found that the retroactive application of the 70% rule violated the Ex Post
Facto Clause in *Wood v. Pallito*, No. 947-12-09 Wncv, 2010 WL 4567692 (Vt. Super.
Ct. Nov. 3, 2010).  Mr. Chandler does not claim that, after *Wood*, the DOC has
continued to apply 28 V.S.A. § 204b to him.  He does suggest in passing that the
DOC may be exercising its discretion in connection with his programming to
achieve the same result.  He has provided no evidentiary support for such
speculation, however.

Mr. Chandler's ex post facto claim is premised on a series of interrelated laws and policies that, taken together, allegedly have an adverse impact upon him. First, he maintains that the Parole Board is highly unlikely to grant parole until he successfully participates in conditional reentry furlough. To be eligible for furlough, he needs to complete institutional programming. The DOC, however, has concluded that he will not be offered programming at this point, which has the effect of denying him any realistic chance for parole.

To be clear, Mr. Chandler's argument is not that the purported requirements of participating in institutional programming and conditional reentry furlough are ex post facto. Similarly, he does not argue that the Parole Board's strong preference for successful participation in furlough prior to granting furlough is, alone, ex post facto. He claims an ex post facto violation because: (1) an unspecified and "unwritten policy" of DOC, presumably, much tougher treatment of violent or sexual offenders; (2) does not allow him to participate in institutional programming; (3) prevents furlough; and (4) inevitably leads to the denial of parole.

2.    Relevant Legal Provisions

In 1997, an inmate such as Mr. Chandler would have become eligible for parole upon completing the minimum term of his sentence. 28 V.S.A. § 501(a) (1997). This remains the case today. 28 V.S.A. § 501(2).

The furlough statute in 1997 was fully discretionary with the DOC and did not include anything in the nature what is now known as reintegration and conditional reentry furlough.[3] 28 V.S.A. § 808 (1997). The current furlough

---

[3] As a general matter, reintegration and conditional reentry furlough are rehabilitative in nature and plainly work to inmates' benefit rather than

3

statutes give the DOC discretion to place an inmate on reintegration furlough up to 180 days prior to the minimum. 28 V.S.A. §§ 808(a)(6), 808c(a)(1). The DOC also has discretion, when the sentence minimum is reached, to release "the offender to participate in a reentry program while serving the remaining sentence in the community." 28 V.S.A. § 723(a).

The conditional reentry statutes include a provision that requires the DOC to make a "recommendation relative to whether the offender should be released to parole" with regard to furloughed inmates. 28 V.S.A. § 725. For inmates convicted of listed offenses, such as Mr. Chandler, that recommendation is required when "in the sole discretion" of the DOC, the inmate has successfully completed 180 days of supervision in the community. *Id.* § 725(2). There is no statute requiring the Parole Board to defer to that recommendation.

As a result of the above statutory timelines, an offender in Mr. Chandler's position, can qualify for reintegration furlough six months prior to his minimum. He can then successfully complete the furlough and seek parole at his minimum release date. Accordingly, even if the Parole Commission has a strong preference for completion of furlough prior to the grant of parole, nothing in the furlough statutes precludes an offender from meeting that preference.

From the time that Mr. Chandler's offenses were committed to the present, there has never been any statutory limitation on the DOC's discretion over programming decisions (both the suitability for programming and the nature of it)

---

disadvantage. It is Mr. Chandler's current inability to qualify for furlough due to the DOC's programming decisions to which he objects.

4

and over its decisions regarding an inmate's suitability for furlough. This decision-making has remained fully discretionary at all relevant times.

3.     Summary Judgment Standard

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Vt. R. Civ. P. 56(a). "In determining whether a genuine issue of fact exists, the nonmoving party receives the benefit of all reasonable doubts and inferences." *Samplid Enterprises, Inc. v. First Vermont Bank*, 165 Vt. 22, 25 (1996). "Where . . . the moving party does not bear the burden of persuasion at trial, it may satisfy its burden of production by indicating an absence of evidence in the record to support the nonmoving party's case. The nonmoving party then has the burden of persuading the court there is a triable issue." *Mello v. Cohen*, 168 Vt. 639, 639–40 (1998).

4.     Burden of Proof

The ultimate burden of proving an Ex Post Facto Clause violation is on the claimant, Mr. Chandler. *See California Dep't of Corrections v. Morales*, 514 U.S. 499, 510 n.6 (1995) (noting "the settled rule that a claimant must bear the risk of nonpersuasion as to the existence of an alleged constitutional violation"); *Evans v. Gerry*, 647 F.3d 30, 35 (1st Cir. 2011).

5.     Analysis

As the United States Supreme Court has explained, the Ex Post Facto Clause bars legislative acts that "retroactively alter the definition of crimes or increase the

5

punishment for criminal acts."[4] *Collins v. Youngblood*, 497 U.S. 37, 43 (1990). "Critical to relief under the Ex Post Facto Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." *Weaver v. Graham*, 450 U.S. 24, 30 (1981). The Court has "long held that the question of what legislative adjustments 'will be held to be of sufficient moment to transgress the constitutional prohibition' must be a matter of 'degree.'" *Morales*, 514 U.S. at 509 (quoting *Beazell v. Ohio*, 269 U.S. 167, 171 (1925)).

The Ex Post Facto Clause applies to laws and legislative acts, whether adopted by the legislature or through formal agency rulemaking. *Prater v. U.S. Parole Com'n*, 802 F.2d 948, 954 (7th Cir. 1986). A legislative regime that includes discretion is not for that reason totally immune from the protections of the Clause. *Garner v. Jones*, 529 U.S. 244, 253 (2000). But, where broad discretion is involved, the Clause does not fossilize how it may be exercised. *Id.* at 253–54. Indeed, the Court has acknowledged that the values that inform discretionary decision-making may well change over time and that such changes do not implicate the Ex Post Facto Clause. *Id.*

---

[4] In some early decisions, the United States Supreme Court had "suggested that enhancements to the measure of criminal punishment fall within the *ex post facto* prohibition because they operate to the 'disadvantage' of covered offenders." *Morales*, 514 U.S. at 506 n.3. In *Morales*, however, the Court clarified that "the focus of the *ex post facto* inquiry is not on whether a legislative change produces some ambiguous sort of 'disadvantage,' nor . . . on whether an amendment affects a prisoner's 'opportunity to take advantage of provisions for early release,' . . . but on whether any such change alters the definition of criminal conduct or increases the penalty by which a crime is punishable." *Id.*

Mr. Chandler has failed to identify any ex post facto violation in this case. He remains eligible for parole and he does not assert that the Parole Board's broad discretion to grant or deny it is any different now than at the time of his offenses. If the DOC's programming decisions regarding Mr. Chandler have resulted in a diminished likelihood of parole at this time, that result necessarily follows from the DOC's fully discretionary determination that he is not yet ready to begin the programming that might, at some point, demonstrate that he is suitable for the furlough and that, in turn, might persuade the Parole Board that he is suitable for parole. Such decisions are committed fully to the DOC's discretion. They are not "legislative acts."

There can be no question that the DOC has extremely broad discretion over programming decisions. *Rheaume v. Pallito*, 2011 VT 72, ¶ 11, 190 Vt. 245, 250. That discretion extends to the DOC's determination of the appropriate timing for an inmate to begin programming. *Wool v. Bullard*, No. 203-4-15 Wncv, 2015 WL 5311521, at *1 (Vt. Super. Ct. Aug. 18, 2015) ("The decision at issue in this case is the timing of programming. The DOC has decided that now is not the appropriate time for Mr. Wool to participate in VTPSA. The decision falls squarely in the *Rheaume* line of authority and is not reviewable in this case."). The DOC's discretion in this regard was no less broad before the events that led to Mr. Chandler's incarceration than after.

Mr. Chandler argues, without supporting evidence, that the DOC has implemented an unwritten policy, presumably, of keeping offenders similar to him incarcerated until some unspecified point in time rather than legitimately exercising its programming discretion. This argument fails for two reasons. First,

7

it is simply not supported by the record.  The available evidence in the record shows that the DOC has evaluated Mr. Chandler's suitability for programming and decided that now is not the time.  *See* Letter from Kim Bushey to Mr. Chandler (dated Feb. 16, 2011) ("The egregious nature of the offenses indicates that the potential risk of harm and risk to public safety would not be sufficiently mitigated by program participation to support your release at your minimum.").  There is no evidence that the DOC has "refused" to exercise its discretion or applied any nondiscretionary rule to him, written or unwritten.[5]

Second, even if the DOC has developed a general approach of denying early programming for inmates such as Mr. Chandler that is different from its historical practice, the change in the way that DOC exercises its discretion does not amount to a legislative act and an ex post facto violation.  Decisions from the United States Courts of Appeal and United States Supreme Court in the context of parole and sentencing guidelines explain why.

In the 1980s, the United States Parole Commission revised the guidelines by which federal parole decisions were made.  The retroactive application of the new guidelines led to ex post facto litigation because many prisoners found that the new guidelines produced more onerous parole decisions.  By statute, the Commission had unreviewable discretion over the substance of parole decisions but was required to adopt guidelines to direct the exercise of that discretion.  *Wallace v. Christensen*, 802 F.2d 1539, 1544–45 (9th Cir. 1986) (*en banc*).  The Circuit Courts largely

---

[5] Neither party in this case developed the record with more direct evidence regarding the DOC's exercise of its programming discretion, or lack thereof, in Mr. Chandler's case.  The burden of proof on this point is on Mr. Chandler, however.  He has not met his burden and has not filed any affidavit attesting to the need for additional discovery on the issue under Vt. R. Civ. P. 56(d).

rejected ex post facto challenges arising when the guidelines were amended because the guidelines, new or old, were themselves merely the Commission's expression of how its parole discretion should be exercised; the guidelines were not *laws or legislative acts* within the meaning of the Ex Post Facto Clause. *Id.* at 1553–54 (collecting cases). A mere change in the way an agency with pre-existing discretion exercises that discretion is outside the scope of the Ex Post Facto Clause.

Against that backdrop, in 1983 the Florida Legislature replaced its system of indeterminate sentencing with a regime of sentencing guidelines proposed by a guidelines commission and adopted by the Florida Supreme Court. *Miller v. Florida*, 482 U.S. 423, 425 (1987). Subsequent revisions to the guidelines had to be adopted by the Legislature. *Id.* The guidelines produced a presumptive sentence range within which the trial judge had unreviewable discretion to choose any particular defendant's sentence. *Id.* at 426. The trial judge had discretion to sentence outside of the presumptive range, but only for "clear and convincing reasons" and the departure itself was reviewable. *Id.* When Mr. Miller committed his offenses, the 1983 guidelines were in place. When he was sentenced, revised guidelines had been adopted by the Legislature. He was sentenced pursuant to the revised guidelines, which produced a more severe sentencing range. *Id.* at 427. This led to an ex post facto challenge that reached the United States Supreme Court.

The Court unanimously found that the retroactive application of the revised guidelines violated the Ex Post Facto Clause. The old guidelines would have produced a 3 1/2–4 1/2 year presumptive sentence. The new guidelines produced a 5 1/2–7 year presumptive sentence. *Id.* at 432. Miller was sentenced to 7 years.

9

While the sentencing judge under the old guidelines could have departed from them and delivered a sentence within the range produced by the new guidelines, he could have done so only for clear and convincing reasons and that decision would be subject to review. The revision to the guidelines clearly and tangibly increased the punishment for Mr. Miller's offense after it had been committed and was ex post facto.[6]

The Supreme Court rejected Florida's argument that its guidelines merely served to influence the trial judge's sentencing discretion in the same way as the United States Parole Commission's suitability guidelines. It explained that the Parole Commission cases are "inapposite" because the many Circuit Courts addressing the matter found the parole guidelines to "merely rationalize the exercise of statutory discretion" and not be laws within the contemplation of the Ex Post Facto Clause. On the other hand, the Florida revised guidelines were adopted by its Legislature and "create[d] a high hurdle that must be cleared before discretion can be exercised." *Id*. at 435. In other words, the revised sentencing guidelines were a legislative act that limited the way that discretion could be exercised. The parole guidelines, on the other hand, were not a legislative act.

---

[6] Guidelines aside, if Mr. Miller had merely argued that sentencing judges used to exercise their sentencing discretion to produce more favorable sentences, and now they exercise it to produce more onerous sentences, there would be no law or legislative act at issue for ex post facto purposes. A mere change in the way discretion is exercised cannot establish an ex post facto violation. Yet this, in effect, is what Mr. Chandler is claiming here: that the DOC used to exercise its discretion in a way that was more favorable to him and now it exercises it in a way that is less favorable to him. There is no legislative act at issue here. Pointing to the more onerous effect (diminished odds of parole) is not enough to establish a violation of the Clause.

They simply represented a shift in the way that pre-existing discretion would be exercised by the entity entrusted to exercise it.

In this case, at most, Mr. Chandler has demonstrated that the DOC has always had discretion over programming decisions and that it may be exercising that discretion differently now than it has in the past. There is no evidence on this record that DOC is applying some unwritten rule or policy to him and, if it is, there is no indication that the policy is anything other than an expression of its pre-existing discretion. Under cases such as *Wallace* and *Miller*, such exercises of discretion do not establish an ex post facto violation.

Nor is this a case in which the Legislature has done something through agency rulemaking that it could not do directly. As one Court has described, the question may be framed as whether the administrative rule is legislative or interpretive in nature.

> As the text of the [Ex Post Facto] Clause makes clear, the ex post facto prohibition applies only to "laws." Accordingly, "[t]he constitutional prohibition against ex post facto laws . . . is directed to the legislative branch of government rather than to the other branches." This is not to say, however, that all actions of administrative agencies are exempt from Ex Post Facto Clause scrutiny. "When Congress has delegated to an agency the authority to make a rule instead of making the rule itself, the resulting administrative rule is an extension of the statute for purposes of the [C]lause." The reason for applying the Clause to such legislative rules is straightforward: Congress "should not be allowed to do indirectly what it is forbidden to do directly." But when an agency promulgates an interpretive rule, the Ex Post Facto Clause is inapplicable. "[I]nterpretive rules simply state what the administrative agency thinks the statute means, and only 'remind' affected parties of existing duties." Unlike legislative rules, which "ha[ve] the force of law," interpretive rules "are statements of enforcement policy. They are . . . 'merely guides, and not laws: guides may be discarded where circumstances require; laws may not.'"

11

*United States v. Ellen*, 961 F.2d 462, 465 (4th Cir. 1992) (as amended) (citations omitted).

Here, Mr. Chandler has not come forward with evidence of any rule that has been adopted by DOC through the Administrative Procedures Act that is having any impact on his eligibility for parole. Nor has he produced evidence of even an unwritten policy or rule that has such an effect. Again, as set out above in Note 5, Mr. Chandler has the burden of proof on those points, and he has failed to meet that burden.

Mr. Chandler also is not entitled to rely on his own beliefs that the DOC would continue to exercise its unfettered programming discretion in the future in the same way that it did when he was sentenced. "Settled expectations regarding the vigor of enforcement are unreasonable." *Prater,* 802 F.2d at 953. "[D]iscretion, by its very definition, is subject to changes in the manner in which it is informed and then exercised. The idea of discretion is that it has the capacity, and the obligation, to change and adapt based on experience." *Garner,* 529 U.S. at 253. The fact that DOC's exercise of discretion may, for the time being, result in a weaker chance for a positive parole decision for Mr. Chandler does not make its exercise of that discretion unconstitutional.

Mr. Chandler's argument in this case appears to be based largely on a misunderstanding of *Girouard v. Hofmann*, 2009 VT 66, 186 Vt. 153. Mr. Girouard had a parole-eligible life sentence with no minimum. While serving his sentence, the Legislature amended the furlough statute to require completion of a minimum term prior to beginning reintegration furlough. *Id*. at ¶ 3, 186 Vt. at 155. He claimed in the trial court that this amendment, as applied to him, was ex post facto

12

because he had no minimum to serve; could never be furloughed, and, without furlough, he could never be paroled. He had *per se* lost the right to parole eligibility. The trial court dismissed for failure to state a claim.

The Supreme Court reversed for factual development, explaining:

> If in fact the 2001 amendment to the furlough statute created a sufficient risk of eliminating plaintiff's eligibility for parole, then plaintiff's claim of an Ex Post Facto Clause violation may prevail. Plaintiff alleges that the situation here is essentially identical to that in *Knox v. Lanham*, 895 F. Supp. 750 (D. Md. 1995), aff'd, *Worsham v. Lanham*, 76 F.3d 377, 1996 WL 37201 (4th Cir. 1996). In *Knox*, the Maryland Division of Correction issued a new directive giving inmates serving life sentences a higher security designation, which prevented these inmates from participating in work release. Plaintiff alleged that an unwritten policy of the parole board denied parole to any inmate who had not participated in work release. Based on the track record of the board, the court found a violation of the Ex Post Facto Clause . . . . *If plaintiff can prove the link between furlough and parole in the same way that the plaintiff in Knox proved the relationship between work release and parole, he will have established an Ex Post Facto Clause violation.*

*Girouard*, 2009 VT 66, ¶ 11, 186 Vt. at 158 (emphasis added).

On remand, the trial court found that furlough was an important enough consideration for parole that the 2001 amendment had effectively prevented a positive parole decision. The amendment was ex post facto as to Girouard and the DOC was ordered to evaluate him for furlough under the prior statute.[7] *In re Girouard*, 2014 VT 75, ¶ 4, 197 Vt. 162, 163.

Mr. Chandler has seized on the emphasized sentence above and has endeavored also to prove a "link" between furlough and parole. This case is not analogous to *Girouard* or the case to which the *Girouard* Court cited, *Knox*. In *Girouard*, the statutory amendment, a clear legislative act, was found to convert a

---

[7] The trial court's ex post facto decision on remand was not reviewed on appeal.

sentence that was parole-eligible into one that was parole-ineligible because the law precluded Mr. Girouard from participating in furlough. The likelihood that the DOC actually would determine, in its discretion, that Mr. Girouard was appropriate for furlough, or programming that would lead to furlough, simply was not at issue and had nothing to do with the ex post facto violation eventually found. In effect, Mr. Girouard's success in establishing the ex post facto violation in his case placed him in the same position that Mr. Chandler already is in, subject to the DOC's discretion with regard to programming and furlough decisions, and otherwise eligible for parole. The "link" that Mr. Girouard established merely showed that the legislative act, in fact, had the outcome prohibited by the Ex Post Facto Clause: it increased his punishment by eliminating his opportunity for parole. *Girouard* does not stand for the proposition that any decision or circumstance that eventually diminishes the likelihood of a favorable parole decision amounts to an ex post facto violation. Here, even assuming there is a link between a favorable parole determination and furlough,[8] there is simply no law that prevents Mr. Chandler from participating in programming and furlough.

*Knox* is to the same effect as *Girouard*. There, the Parole Commission *inflexibly* required all inmates to progress to a low security level and serve time on work release before it would make a positive parole recommendation necessary to the parole process. *Knox*, 895 F. Supp. at 754. The Commissioner of Corrections

---

[8] On remand, the *Girouard* trial court found an ex post facto violation because it determined that there was an adequate link between furlough and parole. That conclusion was not appealed. It is unclear whether the Parole Board's preference for furlough actually operates in a nondiscretionary manner. In *Knox*, on the other hand, the Court clearly found that the "rules" were being applied in a completely nondiscretionary manner.

14

adopted a *nondiscretionary* rule preventing any inmate with a parole-eligible life sentence from progressing to the low security level that could permit work release. *Id*. at 753. The Court began its analysis with the question of whether the Commissioner's and Parole Commission's rules were "laws" subject to ex post facto scrutiny. *See id*. at 755–56. It found that they were because they were adopted pursuant to authority granted by the Legislature, were completely inflexible, and were not mere guides as to how existing discretion would be exercised. It then found the ex post facto violation. Operating together, those rules converted parole-eligible sentences into parole-ineligible sentences. *Id*. at 758 ("The effect of these changes is to foreclose lifers from ever being able to obtain parole.").

Both *Girouard* and *Knox* are predicated on alterations to "laws" within the contemplation of the Ex Post Facto Clause that took away a substantial personal right—parole eligibility. The Ex Post Facto Clause protects "substantial personal rights against arbitrary and oppressive legislation." *Dobbert v. Florida*, 432 U.S. 282, 293 (1977) (quoting *Gibson v. Mississippi*, 162 U.S. 565, 590 (1896)). Neither case concerns purely discretionary decisions. While parole eligibility is a substantial right of Mr. Chandler's as well, there is no law (or policy or rule in the nature of a law) that has taken away Mr. Chandler's eligibility for parole. Rather, the DOC has simply exercised the discretion that it has always had in determining when Mr. Chandler will become suitable for programming, and it is that exercise of discretion to which Mr. Chandler objects. These are not the sorts of determinations that implicate Ex Post Facto Clause. *See Foster v. Booker*, 595 F.3d 353, 361–65 (6th Cir. 2011) (distinguishing legislative enactments that increase punishment, which may show an ex post facto violation; from a parole board's exercise of its

15

unfettered discretion to offer parole in more limited circumstances, which does not); *see also Shabazz v. Gabry*, 123 F.3d 909, 916 (6th Cir. 1997) (noting that "internal policy directives and memoranda" that merely guide agency decision-making are not laws within the contemplation of the Clause); *Prater*, 802 F.2d at 954 ("[A] mere change in enforcement methods, priorities, or policies, written or unwritten—a change within the scope of the executive branch's discretion in enforcing the laws passed by Congress—does not activate the prohibition against ex post facto laws.").

In sum, Mr. Chandler has failed to come forward with any evidence that a change in the law has caused him to lose the opportunity for parole. A change in the manner by which the DOC exercises its discretion with regard to programming may well have diminished Mr. Chandler's odds of a positive parole decision at this time. Even if that is so, however, it does not present a triable issue with regard to an Ex Post Facto Clause violation.

<u>Order</u>

For the foregoing reasons, Mr. Chandler's motion for summary judgment is denied and the State's motion is granted.

Electronically signed on December 24, 2015 at 01:47 PM pursuant to V.R.E.F. 7(d).

Timothy B. Tomasi
Superior Court Judge

16