James DOMINIQUE, Plaintiff, Appellant,

v.

William WELD, et al., Defendants,
Appellees.

No. 95–1465.

United States Court of Appeals,
First Circuit.

Heard Sept. 15, 1995.

Decided Jan. 18, 1996.

Wendy B. Golenbock, Wayland, MA, for appellant.

Stephen G. Dietrick, Deputy General Counsel, with whom Nancy Ankers White, Special Assistant Attorney General, and Herbert C. Hanson, Senior Litigation Attorney, Massachusetts Department of Correction, were on brief for appellees.

Before BOUDIN,* Circuit Judge,
CAMPBELL, Senior Circuit Judge, and
STAHL, Circuit Judge.

LEVIN H. CAMPBELL, Senior Circuit Judge.

Plaintiff James Dominique, a sentenced inmate in the Massachusetts prison system, was returned to confinement after he had been allowed to participate in a work release program for almost four years. He appeals

---

* Judge Boudin heard oral argument in this matter but has not participated in the issuance of the panel's opinion. The remaining two panelists therefore issue this opinion pursuant to 28 U.S.C. § 46(d).

from the district court's refusal to order reinstatement of his work release status and its dismissal of his related claims, brought under 42 U.S.C. § 1983, alleging violations of the Due Process Clause of the Fourteenth Amendment and the Ex Post Facto Clause. We affirm, albeit for different reasons in light of recent Supreme Court decisions.

## I. Facts

Plaintiff was imprisoned in 1983 for multiple crimes including incest and is scheduled for release in June 2000. In August 1987, he was transferred to the minimum security Massachusetts Correctional Institution at Lancaster ("MCI–Lancaster"). In May 1988, the Superintendent of MCI–Lancaster permitted him to renew his driver's license in connection with work he was then doing on state vehicles. In August 1990, plaintiff was approved for the Community Work Release Program. He became a mechanic for R.M.J. Transportation, Inc., and the following year was permitted to open his own vehicle repair business.

Plaintiff remained in good standing in the work release program. However, in the summer of 1993, access to his license and the keys to his personal vehicle was revoked, causing him to lose his job at R.M.J. Transportation. In April of 1994, he was removed from the work release program. On May 5, 1994, because he was deemed a security risk, he was transferred from MCI–Lancaster to a medium security facility, MCI–Shirley. No hearing occurred before the latter transfer, but reclassification hearings were subsequently held on June 13 and September 23, 1994. Each time, a committee majority recommended plaintiff's transfer to a lower security facility. The Commissioner overruled these recommendations. Plaintiff remains at MCI–Shirley.

Defendants[1] say that they revoked plaintiff's privileges because he remains in denial of his crime (in particular, the incest), and because he had too little accountability at his repair business. They justify taking away plaintiff's license because of revised DOC guidelines providing that only inmates within six months of an approved release date are eligible to use their licenses. They add that his crime makes him a risk to the public safety, and that, having been denied parole on three occasions, he is more likely to attempt to escape. Plaintiff responds that he has never violated any condition of the Community Release Agreement ("Agreement").[2] He claims that his removal resulted from media and public uproar following an incident—wholly unrelated to him—in which an MCI–Lancaster escapee shot a police officer. Plaintiff was never given a written statement of reasons for his removal. New regulations concerning the treatment of sex offenders make plaintiff presently ineligible for work release.

In his district court action, plaintiff alleged that these changes in his status violated the Due Process Clause of the Fourteenth Amendment and the Ex Post Facto Clause. He requested a preliminary injunction ordering that he be reinstated to the work release program. In dismissing the due process claim, the district court held that plaintiff had shown neither a constitutionally-derived nor a state-created liberty interest. This being so, the Fourteenth Amendment did not require the state to provide procedures prior to removing him from the program and returning him to prison. The dis-

1. The defendants are William Weld, Governor of Massachusetts, Thomas Rapone, then-Commissioner of the Department of Public Safety, Larry E. Dubois, Commissioner of the Massachusetts Department of Correction, and Luis Spencer, Superintendent of MCI–Lancaster.

2. The Community Release Agreement for Lancaster pre-release programs requires a participating inmate to signify his understanding that "[i]n accepting and participating in community release programs including all furloughs, work release, and education release opportunities, [he] voluntarily accept[s] the following conditions...." The participant cannot leave the state, cannot leave his assigned location during breaks unless authorized to do so, must be aware of specific requirements and arrangements for each specific release activity, must cooperate with requested medical examinations or searches of lockers or outside work areas, and must conduct himself generally "in accordance with the laws of the state and community."

The Agreement states that "[a]ny violation of community release policies will result in [the participant's] being subject to disciplinary action or prosecution and will not be considered in the future community participation requests."

trict court also found no violation of the Ex Post Facto Clause, because the new regulations governing participation in work release were not punitive but rather related to the public safety. The court denied injunctive relief, as plaintiff had not shown a likelihood of success on the merits.[3]

## II. Standard of Review

■ The district court dismissed plaintiff's claims in response to defendants' motion in the alternative for dismissal under Fed. R.Civ.P. 12(b)(6) or Fed.R.Civ.P. 56. The district court recited the standard governing 12(b)(6) motions to dismiss, but it relied in part on materials outside of the pleadings (including the Agreement and affidavits) to determine whether plaintiff enjoyed a protected liberty interest entitling him to procedural due process before removal from the work release program. We therefore treat the motion as one for summary judgment. *See Smith v. Massachusetts Dep't of Correction,* 936 F.2d 1390, 1394 (1st Cir.1991); Fed. R.Civ.P. 12(b)(6). We review a grant of summary judgment *de novo,* viewing the facts in the light most favorable to the nonmovant, plaintiff. *Coyne v. Taber Partners I,* 53 F.3d 454, 457 (1st Cir.1995).

## III. Due Process Clause of the Fourteenth Amendment

### A. The District Court Decision

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV. The focal issue here is whether plaintiff was deprived of a protected liberty interest. Plaintiff has not asserted that he possessed a liberty interest created by the federal Constitution itself.[4] Rather, he has contended that Massachusetts state regulations and the Community Release Agreement established a state-created liberty interest which defendants could not take away without providing due process. The regulations and Agreement, he argued, cabined officials' discretion and led him legitimately to expect to remain in the work release program so long as he did not violate some express condition. Dominique relied on cases holding that a liberty interest may be created by "explicitly mandatory language" within state regulations. *See Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 463, 109 S.Ct. 1904, 1910, 104 L.Ed.2d 506 (1989); *Hewitt v. Helms,* 459 U.S. 460, 471–472, 103 S.Ct. 864, 871–72, 74 L.Ed.2d 675 (1983); *see also Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983) ("particularized standards or criteria [to] guide the State's decisionmakers") (citation omitted). Dominique pointed to cases of this circuit holding that a signed agreement outlining criteria for participation in and removal from a prison release program may evidence a state-created liberty interest. *Lanier v. Fair,* 876 F.2d 243 (1st Cir.1989); *Brennan v. Cunningham,* 813 F.2d 1 (1st Cir.1987).

---

**3.** The district court dismissed plaintiff's pendant state law claims without prejudice, pursuant to 28 U.S.C. § 1367(c)(3). While appellant's counsel claimed at oral argument a lack of substantive as well as procedural due process, the former theory is not briefed nor does it appear to have been developed below. Accordingly, it was waived. *See Grella v. Salem Five Cent Sav. Bank,* 42 F.3d 26, 36 (1st Cir.1994).

**4.** The Supreme Court has recognized that, in certain circumstances, the Constitution itself may give rise to a liberty interest. *See, e.g., Washington v. Harper,* 494 U.S. 210, 221–222, 110 S.Ct. 1028, 1036–37, 108 L.Ed.2d 178 (1990) (involuntary administration of antipsychotic drugs); *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (involuntary commitment to a mental hospital); *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (revocation of parole). Generally, prisoners under confinement do not have a constitutionally-derived liberty interest. *See, e.g., Hewitt v. Helms,*

459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) (state action taken within sentence imposed); *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) (transfer to higher security prison); *Bowser v. Vose,* 968 F.2d 105, 106 (1st Cir.1992) (denial of furlough); *Lanier v. Fair,* 876 F.2d 243, 246 (1989) (removal from halfway house program); *Brennan v. Cunningham,* 813 F.2d 1, 6 (1st Cir.1987) (same).

The Tenth Circuit recently recognized a constitutionally-derived liberty interest in a case involving a state pre-parole conditional supervision program. *See Harper v. Young,* 64 F.3d 563, 566 (10th Cir.1995) (citing *Edwards v. Lockhart,* 908 F.2d 299, 302–303 (8th Cir.1990) for the proposition that parole and work release should be viewed on a continuum, with the program at issue more closely resembling parole because it allowed a convict "to exist, albeit conditionally, in society on a full-time basis").

The district court analyzed the state regulations and Agreement under *Thompson, Hewitt, Olim* criteria. It concluded that the language relating to Dominique's interest in participating and remaining in the work release program was too provisional to create a constitutionally-protected liberty interest. Neither the regulations nor the Agreement required officials to grant work release status initially or indefinitely. Despite certain similarities between plaintiff's Agreement and agreements in *Brennan* and *Lanier*, the district court determined that, under our latest precedent, language of a more mandatory character was essential.[5]

Plaintiff appealed. Within a week of filing his appellate brief, the Supreme Court issued its opinion in *Sandin v. Conner, infra*, modifying the standard for determining the existence of a state-created liberty interest.

## B. *Sandin v. Conner*

In *Sandin v. Conner*, —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (5–4), the Court criticized its former precedent under which courts examined the language in state statutes and regulations to determine whether a liberty interest was created. This doctrine "encouraged prisoners to comb regulations in search of mandatory language on which to base entitlements to various state-conferred privileges." *Id.* at ——, 115 S.Ct. at 2299. The Court expressed two policy concerns: its prior approach "creates disincentives for States to codify prison management procedures in the interest of uniform treatment." *Id.* The old approach also "has led to the involvement of federal courts in the day-to-day management of prisons," contrary to cases affording state officials appropriate deference and flexibility in prison management. *Id.*

5. *See Bowser v. Vose*, 968 F.2d 105, 108 (1st Cir.1992) (a regulation providing that "[a] resident who satisfies one of the [six enumerated] purposes ... shall be eligible for furlough" was insufficient to create a liberty interest, for "[a]bsent from the regulations ... is any mandatory language directing that a furlough *must* be granted to any inmate who satisfies the eligibility requirements"); *Rodi v. Ventetuolo*, 941 F.2d 22,

The Court held that states may still create liberty interests that afford prisoners due process protections, but explained:

> [T]hese interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes *atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.*

*Id.* at ——, 115 S.Ct. at 2300 (internal citations omitted) (emphasis supplied). Applying this standard to the situation in *Sandin*, the Court concluded that disciplining a prisoner for thirty days in segregated confinement "did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest." *Id.* at ——, 115 S.Ct. at 2301.

## C. Applying *Sandin*

■ Defendants argue that *Sandin* requires this court to affirm the district court's dismissal of plaintiff's due process claim. They agree with the lower court that the language of the regulations and Agreement was insufficient to create a liberty interest in any event, but argue that removal from work release and return to regular confinement did not meet *Sandin*'s new threshold criterion of an "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Id.* at ——, 115 S.Ct. at 2300. If solitary confinement for thirty days did not, in *Sandin*, rise to the level of an "atypical, significant hardship," then surely removal from work release does not do so, defendants say.

Plaintiff replies that *Sandin* is unclear about the extent to which the standard for recognizing liberty interests has changed. He argues that the Due Process Clause still protects inmates against important depriva-

25 (1st Cir.1991) (clearly mandatory regulatory language placed definite substantive limits on officials' actions, as state conceded); *Smith*, 936 F.2d at 1397 (court reserved judgment on the inmate contract because of a misconduct-based violation, but noted a lack of mandatory language limiting discretion in both the contract and the regulations).

tions, and that removal from work release and transfer to a higher security prison constitute an "atypical and significant hardship."

We have some sympathy for plaintiff's complaint. His removal from a work release program in which he was apparently functioning well, and his transfer to a medium security facility, may well, from his perspective, seem unjust. But the federal courts are not authorized by law to second-guess the policies of prison administrators in a general sense. The question assigned to us is whether plaintiff had a liberty interest in remaining in work release status, such that under the Fourteenth Amendment he was entitled to due process of law before that privilege could be revoked. We are constrained to agree with defendants that the new threshold test articulated in *Sandin* precludes our finding a liberty interest and bars relief.[6]

As in *Sandin,* the state's action here did not in any way affect the duration of Dominique's state sentence. *See id.* at ——— ———, 115 S.Ct. at 2301–2302. Additionally, his transfer to a more secure facility subjected him to conditions no different from those ordinarily experienced by large numbers of other inmates serving their sentences in customary fashion. In *Sandin,* the Supreme Court observed that conditions in the segregated confinement at issue "mirrored those conditions imposed upon inmates in administrative segregation and protective custody." *Id.* at ———, 115 S.Ct. at 2301 (footnote omitted). The Court found support in this similarity for the proposition that "[b]ased on a comparison between inmates inside and outside disciplinary segregation, the State's actions in placing him there for 30 days did not work a major disruption in his environment." *Id.* (footnote omitted). Similarly here, any hardship was not "atypical" in relation to the ordinary incidents of prison life.

It is true that there is a considerable difference between the freedoms Dominique enjoyed when he was in work release status and the conditions of incarceration at a medium security facility. To return from the quasi-freedom of work release to the regimentation of life within four walls may be said, relatively speaking, to have been a "significant" deprivation. Nonetheless, confinement within four walls of the type plaintiff now endures is an "ordinary incident of prison life." It is not "atypical." The Court has noted that an inmate's *subjective* expectations are not dispositive of the liberty-interest analysis. *See id.,* ——— U.S. at ——— n. 9, 115 S.Ct. at 2301 n. 9.

If Dominique's contrary argument were to prevail, we would open the door to finding an "atypical . . . restraint" whenever an inmate is moved from one situation to a significantly harsher one that is, nonetheless, a commonplace aspect of prison existence. For example, a liberty interest could be claimed if an inmate were moved into less agreeable surroundings than his initial placement. Similarly, a liberty interest might be claimed whenever authorities or the state legislature decided to eliminate or cut back work release programs or furloughs. Such changes, painful to those affected, could be regarded under plaintiff's argument as implicating liberty interests even though the prisoner was never placed in conditions going beyond the customary rigors of prison life. Such an outcome, we believe, would directly conflict with *Sandin*'s teachings. *Sandin*'s new standard was expressly adopted by a majority of the Supreme Court "to afford appropriate deference and flexibility to state officials trying to manage a volatile environment." *Id.* at ———, 115 S.Ct. at 2299. The Court plainly intended to eliminate the basis for federal due process claims stemming from internal transfers and status changes that do not result in "atypical hardship," *i.e.,* hardship beyond the norms of ordinary prison life. Hence the state's removal of Dominique's measure of freedom, replacing it with confinement of a sort commonly associated with ordinary prison life, did not violate anything that can be termed a liberty interest. *See Klos v. Haskell,* 48 F.3d 81 (2d Cir.1995) (a pre–*Sandin* case denying relief on strikingly similar facts,

---

6. *Sandin* applies retroactively to the present case, the Supreme Court having applied the rule announced in *Sandin* to the parties in that case. *See Rivers v. Roadway Express, Inc.,* ——— U.S.

———, ———, 114 S.Ct. 1510, 1519, 128 L.Ed.2d 274 (1994); *Harper v. Virginia Dep't of Taxation,* 509 U.S. 86, 113 S.Ct. 2510, 2517, 125 L.Ed.2d 74 (1993).

cited with apparent approval in *Sandin*, —— U.S. at ——–——, 115 S.Ct. at 2299–2300).

Plaintiff urges that execution of the Agreement shows that a matter sufficiently important to give rise to a liberty interest is at stake. Prison officials, it is said, do not enter into agreements with inmates concerning the ordinary incidents of prison life. As the district court found, however, the Agreement preserved broad decisionmaking authority of state officials and the regulations did not impose any duty to retain plaintiff in the work release program. And, that analysis aside, withdrawal of work release privileges did not meet *Sandin*'s threshold test of working a "significant and atypical hardship in relation to the ordinary incidents of prison life." While we may regret the disappointment and frustration inherent in such withdrawal, the hardship was not "atypical." *Cf. Bulger v. United States Bureau of Prisons*, 65 F.3d 48, 49–50 (5th Cir.1995) (inmate terminated from a prison job permitting the automatic accrual of good-time credits lacked a protected liberty interest, despite apparent violation of a state regulation); *see also Mitchell v. Dupnik*, 67 F.3d 216, 221 (9th Cir.1995) (inmate lacked a protected liberty interest, despite corrections officer's violation of prison regulations); *Orellana v. Kyle*, 65 F.3d 29, 32 (5th Cir.) ("the ambit of [prisoners'] potential Fourteenth Amendment due process liberty claims has been dramatically narrowed" by *Sandin* ), *cert. denied*, —— U.S. ——, 116 S.Ct. 736, 133 L.Ed.2d 686 (1996).

Under the standard announced in *Sandin*, we hold that plaintiff's loss of work release privileges did not affect any state-created liberty interest of his, hence did not violate the Due Process Clause.[7]

## IV. Ex Post Facto Clause

Plaintiff asserts a violation of the Ex Post Facto Clause based on a new state regulation governing the treatment and movement of sex offenders from commitment to release. *See* 103 DOC § 446.[8] The regulation became effective in October 1994, at which time plaintiff was incarcerated at the medium security facility to which he had been transferred following his removal from work release earlier that year. Plaintiff does not dispute the Commonwealth's contention that under the regulation, he is presently ineligible to participate in the work release program. While the district court did not articulate a basis for this ineligibility (instead assuming that was so), plaintiff appears to be an identified sex offender who may not be moved to a minimum security facility, with associated privileges, unless and until he successfully completes a treatment program, admits his offense, and otherwise obtains approval for a transfer. *See id.* §§ 446.07, 446.08(4), 446.13.

■ The district court rejected plaintiff's claim that the regulation amounted to punishment applied retroactively to plaintiff's of-

7. The inmate in *Sandin* based his claim to a protected liberty interest on state regulations alone, and not on any written agreement with the state, as is also present here. The parties have not argued that *Sandin* is inapplicable for this reason. This court's prior relevant cases have applied a language-focused approach to the state scheme as a whole, whether or not an agreement was involved. *See, e.g., Rodi*, 941 F.2d at 26 ("Our own precedents similarly teach that the appropriate [*Thompson/Hewitt*] constitutional analysis looks beyond the State's statutes to administrative rules, regulations, contractual commitments, and the like."); *Lanier*, 876 F.2d at 248.

8. The Sex Offender Treatment policy applies to inmates serving a sentence for or convicted in the past of a sex offense, or serving a sentence for a non-sexual offense where "[t]here are sexual overtones in the reading of the official version of a crime for which the inmate may have been charged and sentenced." 103 DOC § 446.08.

The policy's expressed goal is "to create a system in which there is a continuum of service from the time an inmate with such a background is committed, until he/she is released to the community, and hopefully beyond." *Id.* § 446.07.

The policy requires identified sex offenders to complete a four-phase treatment program at a medium security facility as a precondition for transfer. It outlines further transition phases and evaluation processes as well. Transfer appears ultimately possible absent "program failures," defined to include inmates who remain in denial of their offense, those who "refuse to participate or minimize with regard to their offense(s)," and those at the non-secure facility treatment phase who move toward relapse or otherwise become "at risk." *Id.* § 446.13. The regulations also contain a sex offender "notice of release" provision, which is not at issue in this appeal. *See id.* § 446.14.

fense. The court reasoned that the regulation was "driven by safety concerns, and not by a desire to impose further punishment on prisoners." We affirm, again guided by a recent Supreme Court decision.[9]

The Ex Post Facto Clause provides that "No State shall ... pass any ... ex post facto Law." U.S. Const. art. I § 10. Ex post facto laws include "'every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.'" *Miller v. Florida,* 482 U.S. 423, 429, 107 S.Ct. 2446, 2450, 96 L.Ed.2d 351 (1987) (quoting *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798)).

■ Defendants have not argued that the new regulation is not a "law" for ex post facto purposes. There is some disagreement among the circuits on this matter. *Cf. Bailey v. Noot,* 503 U.S. 952, 112 S.Ct. 1516, 117 L.Ed.2d 652, *cert. denied* (1992) (White, J., dissenting) (noting circuit split on whether Clause applies to revised state parole regulations).[10] In past cases we have applied the Clause to the federal Sentencing Guidelines, *see, e.g., United States v. Harotunian,* 920 F.2d 1040, 1041–1042 (1st Cir.1990), and rules issued by a state agency, *see Martel v. Fridovich,* 14 F.3d 1, 3 (1st Cir.1993) (Massachusetts Department of Mental Health). We need not address the possible limits of these holdings, for the parties have not raised the issue and we find that no violation occurred, even assuming arguendo that the Clause applies to the regulation at issue. *Accord Hamm v. Latessa,* 72 F.3d 947, 956–57 & n. 14 (1st Cir.1995) (declining to decide whether

a parole eligibility policy was a "law" for ex post facto purposes).

The Supreme Court has reiterated recently that the proper focus of ex post facto inquiry is whether the relevant change "alters the definition of criminal conduct or *increases the penalty* by which a crime is punishable." *California Dep't of Corrections v. Morales,* — U.S. ——, —— n. 3, 115 S.Ct. 1597, 1602 n. 3, 131 L.Ed.2d 588 (1995) (emphasis supplied); *see also Collins v. Youngblood,* 497 U.S. 37, 43, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990) (citing *Calder,* 3 U.S. (3 Dall.) at 391–392). *Morales* examined a California statutory amendment which authorized the Board of Prison Terms to defer for up to three years parole suitability hearings for multiple murderers. The Court found no ex post facto violation, because the amendment "create[d] only the most speculative and attenuated possibility of producing the prohibited effect of increasing the measure of punishment for covered crimes." *Morales,* — U.S. at ——, 115 S.Ct. at 1603. The Court did not develop a precise formula; rather, it said, these judgments "*must* be a matter of 'degree.'" *Id.* (internal citation omitted). It stated, however, that a change that "simply 'alters the method to be followed' in fixing a parole release date under identical substantive standards," but does not change the applicable sentencing range, was insufficient. *Id.* at ——, 115 S.Ct. at 1602 (internal citation omitted); *cf. Miller v. Florida,* 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987) (violation found where statutory amendment increased presumptive sentenc-

**9.** Plaintiff's ex post facto claim is not barred by our above ruling that he lacks a protected liberty interest. As the Supreme Court has stated, "Evaluating whether a right has vested is important for claims under the Contracts or Due Process Clauses, which solely protect pre-existing entitlements.... The presence or absence of an affirmative, enforceable right is not relevant, however, to the ex post facto prohibition...." *Weaver v. Graham,* 450 U.S. 24, 29–30, 101 S.Ct. 960, 964–65, 67 L.Ed.2d 17 (1981); *Jones v. Georgia State Bd. of Pardons & Paroles,* 59 F.3d 1145, 1148 n. 6 (11th Cir.1995).

**10.** The dispute appears to turn on whether a rule is legislative (based on a delegation of statutory authority) or merely interpretive, and whether a legislative rule is binding or merely guides the

exercise of discretionary power. *See, e.g., Jones,* 59 F.3d at 1149 n. 8 (applying Clause to state parole rules and comparing cases); *Kellogg v. Shoemaker,* 46 F.3d 503, 509 (6th Cir.) (applying Clause to binding parole regulations), *cert. denied,* — U.S. ——, 116 S.Ct. 120, 133 L.Ed.2d 70 (1995) and — U.S. ——, 116 S.Ct. 274, 133 L.Ed.2d 195 (1995); *Francis v. Fox,* 838 F.2d 1147, 1149–1150 (11th Cir.1988) (holding that state work release regulation was not an ex post facto "law"); *Faruq v. Herndon,* 831 F.Supp. 1262, 1279–1280 (D.Md.1993) (holding that work release and security classification regulations were not ex post facto "laws"), *aff'd, Briscoe v. Herndon,* 56 F.3d 60, 1995 WL 318665 (4th Cir. 1995).

ing range for certain sexual offenses and permitted departure only for "clear and convincing reasons"); *Weaver v. Graham*, 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981) (violation found where the statute retroactively reduced "gain time" credits to prisoners, thereby eliminating the lower end of the possible range of prison terms).

The question here, as in *Morales*, is whether the instant regulation "increases the penalty by which a crime is punishable." *Morales*, —— U.S. at —— n. 3, 115 S.Ct. at 1602 n. 3. It can be argued that the regulation increases the penalty because it subjects Dominique to a different and stricter prison regime: unless and until he successfully completes the prescribed treatment program and admits to a crime he continually has denied, he must remain confined at no less than a medium security facility and remain ineligible for privileges associated with lower security imprisonment. We conclude, however, that this change in the conditions determining the nature of his confinement while serving his sentence was an allowed alteration in the prevailing "legal regime" rather than an "increased penalty" for ex post facto purposes. *See id.* at —— n. 6, 115 S.Ct. at 1603 n. 6; *cf. In re Medley*, 134 U.S. 160, 10 S.Ct. 384, 33 L.Ed. 835 (1890) (discussing extreme penalty of solitary confinement and finding an ex post facto violation where a new statute required a prisoner to serve four weeks in complete isolation before being executed at a time unknown to him); *see also Ewell v. Murray*, 11 F.3d 482, 487 (4th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2112, 128 L.Ed.2d 671 (1994) (finding that a new regulation punishing a prisoner's refusal to submit to a DNA test by a loss of good-time credits and possible isolated placement for up to 15 days was not an ex post facto violation but was "reasonably within the administrative structure of prison authority that attends every sentence").

The change does not affect the length of Dominique's sentence or his parole options. *Cf. Morales*, —— U.S. at —— & n. 6, 115 S.Ct. at 1603 & n. 6 (emphasizing speculative effect on prisoner's actual term of confine-ment, and stating that the ex post facto clause does not "require that the sentence be carried out under the identical legal regime that previously prevailed"); *Hamm*, slip op. at 28, 72 F.3d at 961 (finding no ex post facto violation where a revised parole policy which postponed a prisoner's initial parole hearing presented a speculative risk of extending his sentence). *Compare Vargas v. Pataki*, 899 F.Supp. 96, 99 (N.D.N.Y.1995) (statutory amendment making an applicant for work release no longer eligible was not an ex post facto violation) *with Knox v. Lanham*, 895 F.Supp. 750, 758 (D.Md.1995) (change in security classification and work release policies violated the ex post facto clause where they "directly impact[ed] upon [lifers'] actual eligibility for parole").

While the matter is perhaps close, we conclude that plaintiff has not satisfied his burden of showing an increased penalty for his crime. *See Morales*, —— U.S. at —— n. 3, 115 S.Ct. at 1602 n. 3 (challenging party has "ultimate burden of establishing that the measure of punishment itself has changed"). The regulation appears primarily to affect the methods followed to treat certain sex offenders for a period of time, *e.g.*, with regard to facility placement and treatment programs. The Ex Post Facto Clause does not encourage close scrutiny by the federal courts of ongoing procedural or operational changes in prisons to coordinate treatment, promote security, and protect the public safety. *See id.* at ——, 115 S.Ct. at 1603; *Martel*, 14 F.3d at 2.

*Affirmed.*