THIRD DIVISION 

December 4, 1998

Nos. 1-96-0782 & 96-0979 (cons.)

IN THE INTEREST OF J.R., A minor, and T.J., A minor,

(PEOPLE OF THE STATE OF ILLINOIS,

Petitioner-Appellee,

v.

J.R., A minor, and T.J., A minor,

Respondents-Appellants.)

)

)

)

)

)

)

)

)

)

Appeal from the

Circuit Court of

Cook County

No. 94JD16144

Honorable

Carol A. Kelly,

Judge Presiding.

JUSTICE LEAVITT delivered the opinion of the court:

Petitions for adjudication of wardship were filed against minor respondents J.R., age 10, and T.J., age 11.  Following adjudicatory hearings, both respondents were found delinquent for committing first degree murder.  Following dispositional hearings, both were adjudged wards of the court and committed to the Department of Children and Family Services (DCFS).  DCFS filed motions to transfer respondents to the Illinois Juvenile Department of Corrections (JDOC) pursuant to section 3-10-11 of the Unified Code of Corrections (Code) (730 ILCS 5/3-10-11 (West 1995)).  These motions were granted, and this appeal followed.

Derrick Lemon, the eight-year-old brother of the victim Eric Morris, testified that on the evening of October 13, 1994, he was walking with his five-year-old brother Eric when they were approached by respondents, who asked them if they wanted to see their clubhouse.  The two brothers followed respondents to an abandoned 14th-floor apartment located at 3833 South Langley in Chicago.  Eric arrived at the apartment first.  The apartment had two windows, one of which was boarded.  When Derrick entered the apartment, he saw respondents preparing to throw his little brother out of the window.  T.J. was hanging Eric out of one window while J.R. was removing a wooden board off the other window.  Derrick grabbed Eric's arms and managed to pull him back inside the apartment.  

J.R., who was standing by one window, then announced, "Look, there's a fight going on," and T.J. ordered Eric to look out the window.  T.J. told Eric, "If you don't look I'll hit you in the head with a brick."  As Eric went to the window to observe the (nonexistent) fight, both respondents attempted to throw him out of the window.  T.J. held Eric by his arm while J.R. held him by his waist, together lifting Eric out the window.

At this point, Derrick tried to save his brother by grabbing his arm.  T.J. then released his hold on Eric and bit Derrick's finger, causing Derrick also to release his hold on Eric.  As Eric fell to his death, Derrick ran down the 14 flights of stairs hoping to reach his little brother before he hit the ground.

Minor respondents were arrested in connection with the death of Eric Morris, and both gave statements substantially confirming Derrick's account of his brother's death.

[Nonpublishable material under Supreme Court Rule 23 omitted.]

Both T.J. and J.R. argue that their transfers to the JDOC, pursuant to an amendment to section 3-10-11 of the Code, violated the 
ex
 
post
 
facto
 clauses of the United States and Illinois Constitutions.  See U.S. Const., art.  I, §§ 9, 10; Ill. Const. 1970, art. I, § 16.  Prior to the date of the instant offense, no juvenile under the age of 13 could be committed to the JDOC.  See 705 ILCS 405/5-23(1)(b) (West 1994) ("A minor found to be delinquent may be committed to the Department of Corrections, Juvenile Division, *** if the minor is 13 years of age or older ***").  But 
cf
. 730 ILCS 5/3-10-11(a) (West 1994) ("If 
a
 
minor
 is adjudicated a delinquent *** and placed with [DCFS], *** [DCFS] may transfer the minor to the Juvenile Division of the Department of Corrections ***") (emphasis added).  At the time of Morris' murder, J.R. was 10 and T.J. was 11.  Section 3-10-11 was amended, effective January 1, 1995, to permit the transfer of minors as young as 10 to the JDOC.  See Pub. Act 88-680, eff. January 1, 1995 (amending 730 ILCS 5/3-10-11 (West 1994)).  Since the instant offense occurred on October 13, 1994, respondents argue application of the amended version of section 3-10-11 to them was unconstitutional.  

The 
ex
 
post
 
facto
 prohibition of the Illinois Constitution has been read consistently with its Federal counterpart.  
Fletcher v. Williams
, 179 Ill. 2d 225, 229, 688 N.E.2d 635 (1997); 
Barger v. Peters
, 163 Ill. 2d 357, 360, 645 N.E.2d 175 (1994).  But 
cf
. 
People v. Krueger
, 175 Ill. 2d 60, 74, 675 N.E.2d 604 (1996).  Under either provision, a criminal law will be invalidated if: (1) it is retrospective, 
i.e.
, it applies to events occurring prior to its enactment, and (2) it falls into one of the traditional categories of prohibited criminal laws.  
Fletcher
, 179 Ill. 2d at 230.  These traditional categories include any statute which punishes as a crime a previously committed act, innocent when done; laws which make the punishment for a crime more burdensome after its commission; and statutes which deprive one charged with a crime of any defense available at the time when the act was committed.  
Fletcher
, 179 Ill. 2d at 229; 
Collins v. Youngblood
, 497 U.S. 37, 41, 110 S.Ct. 2715, 2718, 111 L.Ed. 2d 30, 38 (1990); see also 
Calder v. Bull
, 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648, 650 (1798).  The question in the present case is whether the amendment to section 3-10-11 "make[s] the punishment for a crime more burdensome after its commission."

Initially, we note T.J. fails the first test in attempting to prove he was the victim of an 
ex
 
post
 
facto
 law, 
i.e.
, that the amendment to section 3-10-11 was retrospective as applied to him.  Both respondents were adjudged wards of the court, ordered to complete five years' probation, and committed to DCFS in November 1995.  The order committing them to the JDOC was not entered until January 29, 1996.  As of that date, T.J. was 13 years old and, therefore, eligible for commitment to the DOC under either version of the law.  As the Attorney General has correctly pointed out, our supreme court has held that the relevant date for purposes of determining a minor's eligibility for placement in the DOC is the date of the dispositional order.  See 
In re Griffin
, 92 Ill. 2d 48, 50-53, 440 N.E.2d 852 (1982) (finding "the only requirement [for commitment to the DOC] is that the minor be 13 years at the time the order of commitment is entered"); see also 
In re C.D.
, 198 Ill. App. 3d 144, 145, 555 N.E.2d 751 (1990).  T.J., like the minor in 
Griffin
, was 13 at the time the order committing him to the DOC was entered, and his age at the time of the offense, therefore, was irrelevant.  See 
Griffin
, 92 Ill. 2d at 53 (rejecting "[t]he argument that our holding will promote prosecutorial delays that are unnecessary, contrived, and in bad faith" since "[a]n adequate safeguard against such delays *** will be the trial court's sophisticated scrutiny of the ground for requests for continuance").  Thus, no change in the law was retroactively applied to T.J., and his 
ex
 
post
 
facto
 argument was properly rejected by the trial court. 

  Regardless, neither respondent provides us with any relevant case law supporting their contention that the change in section 3-10-11 of the Code permitting their transfers to the JDOC "increases the penalty by which a crime is punishable."  See 
California Department of Corrections v. Morales
, 514 U.S. 499, 506 n. 3, 115 S.Ct. 1597, 131 L.Ed. 2d 588 (1995); see also 
Collins
, 497 U.S. at 43 (holding "[l]egislatures may not retroactively alter the definition of crimes or increase the punishment for criminal acts"); 
Fletcher
, 179 Ill. 2d at 234.  The State maintains the protections of the 
ex
 
post
 
facto
 clauses do not extend to juveniles, inasmuch as "the Juvenile Court Act serves a rehabilitative function and lacks any punitive purpose."  We believe, however, that the 
ex
 
post
 
facto
 clause is applicable to juvenile proceedings, regardless of the labels attached to them.  See, 
e.g.
, 
Virgin Islands v. D.W.
, 3 F.3d 697, 701 (3rd Cir. 1993) (finding retroactive imposition of fine on juvenile violated 
ex
 
post
 
facto
 principles, rejecting government's argument that "because juvenile proceedings serve a rehabilitative rather than a punitive function, any increase in punishment is outside the purview of the Ex Post Facto Clause"); 
Commonwealth v. Kelley
, 411 Mass. 212, 215-16, 581 N.E.2d 472, 474-75 (Mass. 1991) (striking down retroactive extension of juvenile's commitment, despite acknowledging that "the juvenile justice system is not a penal system"); 
United States v. Juvenile Male
, 819 F.2d 468, 470-71 (4th Cir. 1987) (amendment to Juvenile Delinquency Act authorizing prosecution of 15-year-old offenders as adults violated 
ex
 
post
 
facto
 clause where applied retroactively to juvenile, despite claim law was merely procedural); 
In re Appeal in Maricopa County Juvenile Action No. J-92130
, 139 Ariz. 170, 173, 677 P.2d 943, 946 (Ariz. Ct. App. 1984) (invalidating retroactive application of amendment authorizing juvenile court to impose monetary assessment and order restitution when committing delinquent minor to Department of Corrections, noting "the mere fact that the focus of juvenile dispositions is on rehabilitation as a policy is not dispositive of the constitutional question"); 
Johnson v. Morris
, 87 Wash. 2d 922, 928-29, 557 P.2d 1299, 1304-5 (Wash. 1976) (retroactive statute extending juvenile court jurisdiction over delinquent juveniles from age 18 to age 21 violative of 
ex
 
post
 
facto
 clause, despite State's argument that "extension of jurisdiction was not intended to punish this juvenile but rather to provide further drug/alcohol counseling and treatment"); 
In re Valenzuela
, 275 Cal. App. 2d 483, 486-87, 79 Cal. Rptr. 760, 763 (Cal. Ct. App. 1969) (retroactive statute authorizing continuation of juvenile's confinement beyond original discharge date invalid despite government's objection that the new statutory procedures were "civil rather than criminal, rehabilitative rather than punitive"); 
cf
. 
Breed
, 421 U.S. at 529 ("[D]etermining the relevance of constitutional policies, like determining the applicability of constitutional rights, in juvenile proceedings, requires that courts eschew 'the 'civil' label-of-convenience which has been attached to juvenile proceedings,' *** and that 'the juvenile process *** be candidly appraised.'"), quoting 
In re Gault
, 387 U.S. 1, 21, 50, 87 S.Ct. 1428, 18 L.Ed. 2d 527 (1967); 
People ex rel. Carey v. Chrastka
, 83 Ill. 2d 67, 77-78, 413 N.E.2d 1269 (1980) (analyzing Habitual Juvenile Offender Act for 
ex
 
post
 
facto
 violations).  

Retroactive laws which are alleged to have worked an increase in punishment frequently alter one of two aspects of an individual's confinement: the length of the confinement or the conditions of the confinement.  Any retroactive lengthening of an individual's incarceration, regardless of degree, will unfailingly draw a successful constitutional attack.  See, 
e.g.
, 
Kelley
, 411 Mass. 212; 
Johnson
, 87 Wash. 2d 922; 
Valenzuela
, 275 Cal. App. 2d 483.  In fact, it is not necessary that the length of the defendant's sentence be extended; it is enough that the opportunity for parole or early release be curtailed.  Compare 
Lynce v. Mathis
, 519 U.S. 433, 117 S.Ct. 891, 137 L.Ed. 2d 63 (1997) (statute canceling early release credits for certain classes of prisoners held to be invalid 
ex
 
post
 
facto
 law) and 
Weaver v. Graham
, 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed. 2d 17 (1981) (striking down law which reduced formula for calculating future gain time credits) with 
California Dept. of Corrections v. Morales
, 514 U.S. 499, 509, 115 S.Ct. 1597, 1603, 131 L.Ed. 2d 588, 597 (1995) (amendment to parole procedures that decreased the frequency of parole hearings for certain offenders not prohibited on 
ex
 
post
 
facto
 grounds, since change in law created only "speculative and attenuated possibility" of increasing punishment).  In such cases, a violation may be found even if there is no punitive purpose behind the change in the law; where a statute objectively lengthens the period an individual must spend in prison, the legislature's subjective intent in passing the law is irrelevant.  
Lynce
, 117 S.Ct. at 896.  The State correctly points out that neither minor's sentence (five years' probation, before and after the amendment to section 3-10-11) was lengthened in this case.  However, that does not end the inquiry.

A law may also retroactively alter the conditions of an individual's confinement to such a degree that it falls within the prohibitions of the 
ex
 
post
 
facto
 clause.  See 
In re Medley
, 134 U.S. 160, 10 S.Ct. 384 (1890).  In 
Medley
, the Court was faced with an amendment to a Colorado statute which required that a death row inmate be kept in solitary confinement until the time of his execution.  The previous law contained no such provision, and the law was retroactively applied to petitioner.  Rejecting the State's argument that the change in the law was "a mere unimportant regulation as to the safe-keeping of the prisoner," the Court recounted the history of solitary confinement in connection with the death penalty and concluded the Colorado legislature could only have had a punitive purpose in mind when it enacted the statute.  
Medley
, 134 U.S. at 167-68, 10 S.Ct. at 386.  Since the law was punitive in both purpose and effect, the Court found the law imposed "an additional punishment" in violation of the 
ex
 
post
 
facto
 clause.  
Medley
, 134 U.S. at 171, 10 S.Ct. at 387.

Since 
Medley
, however, inmates have had remarkably little success when challenging retrospective changes in the conditions of their confinement on 
ex
 
post
 
facto
 grounds.  These changes are typically viewed as matters relating to penal administration or prison regulation, devoid of punitive purpose, and, therefore, beyond the purview of the 
ex
 
post
 
facto
 clause.  See 
Knox v. Lanham
, 895 F.Supp. 750, 756-58 (D.Md. 1995) (noting "[a] number of cases have held that security classification decisions concern 'internal administration of a prison,' and are not punitive such as to violate the Ex Post Facto Clause"); 
Neal v. State
, 180 Ark. 333, 21 S.W.2d 864, 866 (Ark. 1929) (holding that changes related to prison discipline or penal administration do not raise 
ex
 
post
 
facto
 concerns, even though they may operate to increase the severity of the punishment of the inmate); 
cf
. 
Morales
, 514 U.S. at 510 n.6, 115 S.Ct. at 1603 n.6, 131 L.Ed. 2d at 597 n.6 (
ex
 
post
 
facto
 clause does not "require that the sentence be carried out under the identical legal regime that previously prevailed").  Retroactive reduction or curtailment of furlough, temporary and work release privileges are generally upheld on this basis.  See, 
e.g.
, 
Lee v. Governor of New York
, 87 F.3d 55, 59-60 (2d Cir. 1996) (legislation rendering certain prisoners ineligible for temporary release was "simply a change in the legal regime and [was] not an increase in punishment," noting "there is no allegation that plaintiffs' eligibility for or participation in a temporary release program would have any effect on the length of their sentences"); 
DiStefano v. Watson
, 566 A.2d 1, 8 (Del. 1989) (upholding amendment rendering prisoners generally ineligible for any furlough or work release program during the first ten years of their confinement); 
Milhouse v. Levi
, 548 F.2d 357, 363-64 (D.C.Cir. 1976) (holding Attorney General's order curtailing furlough privileges was not an 
ex
 
post
 
facto
 law, since "[a] furlough program, unlike parole, *** is an internal rehabilitational program the denial of which cannot be said to be an element of the punishment attached to an inmate's initial conviction"); 
cf
. 
Vargas v. Pataki
, 899 F.Supp. 96, 99 (N.D.N.Y. 1995) (law prohibiting inmates convicted of homicide from participating in work release program not 
ex
 
post
 
facto
 law).  

Closely related are changes in the law affecting an inmate's security classification, resulting in more restricted and burdensome conditions of confinement.  These changes are frequently upheld against 
ex
 
post
 
facto
 attack on the same basis.  In 
Dominique v. Weld
, 73 F.3d 1156 (1st Cir. 1996), a new Massachusetts law made convicted sex offenders ineligible for a minimum security facility unless and until the offender successfully completed a treatment program, admitted his offense, and otherwise obtained approval for a transfer.  Plaintiff, a convicted sex offender, was returned to confinement after he had been allowed to participate in a work release program for almost four years.  Noting that there was "a considerable difference between the freedoms Dominique enjoyed when he was in work release status and the conditions of incarceration at a medium security facility" (
Dominique
, 73 F.3d at 1160), the court nevertheless found no 
ex
 
post
 
facto
 violation:

"It can be argued that the regulation increases the penalty because it subjects Dominique to a different and stricter prison regime: unless and until he successfully completes the prescribed treatment program and admits to a crime he continually has denied, he must remain confined at no less than a medium security facility and remain ineligible for privileges associated with lower security imprisonment.  We conclude, however, that this change in the conditions determining the nature of his confinement while serving his sentence was an allowed alteration in the prevailing 'legal regime' rather than an 'increased penalty' for ex post facto purposes."  
Dominique
, 73 F.3d at 1163, quoting 
Morales
, 514 U.S. at 510 n.6, 115 S.Ct. at 1603 n.6, 131 L.Ed. 2d at ___ n.6.

The court further remarked that the change in the law did not affect the length of plaintiff's sentence or his parole options.  
Dominique
, 73 F.3d at 1163.

Other, similar changes to regulations involving prison security have been upheld.  In 
Payton v. Fiedler
, 860 F.Supp. 606 (E.D.Wis. 1994), plaintiff was found to be ineligible for minimum security based upon amended regulations which came into effect long after his offense and conviction.  In 
Dyke v. Meachum
, 785 F.2d 267 (10th Cir. 1986), a new state policy required prisoners to serve 20%, rather than 10%, of their sentences to become eligible for reclassification to minimum security status.  And in 
Neal
, an inmate argued that he had plead guilty with the assurance that he would not serve his time in the penitentiary, but, rather, on the "road district," where, he argued, "he would not have to wear stripes, where health conditions were better ***, where he could see his friends and relatives often, where the hours of service were not as long, and where he would not be compelled to serve with criminals convicted of graver offenses ***."  
Neal
, 21 S.W.2d at 865.  In all three cases, the courts rejected 
ex
 
post
 
facto
 challenges to the changes in conditions.  
Payton
, 860 F.Supp. at 608; 
Dyke
, 785 F.2d at 268; 
Neal
, 21 S.W.2d at 866; see also 
Glynn v. Auger
, 678 F.2d 760, 761 (8th Cir. 1982) (institution of "double celling"--placing two inmates in a single cell--did not violate 
ex
 
post
 
facto
 clause).

In light of these cases, we believe the amendment to section 3-10-11 is more properly viewed as a security classification provision, integral to the juvenile detention system, than as an increase in punishment, violative of the 
ex
 
post
 
facto
 clause.  Like many of the inmates in the cases previously discussed, respondents have simply been transferred to a more secure facility from a less secure one.  While respondents may now be exposed to "a different and stricter prison regime" (see 
Dominique
, 73 F.3d at 1163), such a change in the "legal regime" is permissible.  See 
Morales
, 514 U.S. at 510 n.6, 115 S.Ct. at 1603 n.6, 131 L.Ed. 2d at ___ n.6.  Respondents' sentences have not been extended nor have their opportunities for early release been curtailed.  See 
Knox
, 895 F.Supp. at 756-58 (change of policy requiring transfer of inmates from minimum security or work release to medium security facility, when combined with unwritten requirement of work release for parole eligibility, constitutes a violation of the 
ex
 
post
 
facto
 clause).

Moreover, we find no persuasive evidence that the amendment to section 3-10-11 serves a punitive purpose.  
Cf
. 
Medley
, 134 U.S. at 171, 10 S.Ct. at 387 (suggesting that, to rise to the level of an 
ex
 
post
 
facto
 violation, a change in conditions of confinement--unlike an alteration in the 
length
 of confinement--

must be imposed for a punitive purpose).  Counsel for J.R. points to various comments from the legislative debates surrounding Public Act 88-680 (especially comments from those opposing the bill) in support of the contention that there was a punitive purpose behind the changes to section 3-10-11.  Most of these comments reflect legislators' concerns over the prospects of minors receiving necessary treatment while in the JDOC.  Nevertheless, concern over the rehabilitative potential of the JDOC, however reasonable, does not prove a punitive purpose behind section 3-10-11.

It is clear that the amendment to section 3-10-11 permitting the transfer of juveniles ten or older to the JDOC was not designed to be punitive in operation.  If our legislature had set out with a punitive design in mind, that section could have just as easily been drafted so that placement with the JDOC was 
mandatory
 whenever children ten or older commit murder.  That was not done.  Instead, a statutory scheme was passed which created an independent administrative body which could only 
recommend
 placement in the JDOC, subject to approval by the trial court (with review as a matter of right by this court). 

Foremost among the concerns of the 
ex
 
post
 
facto
 clause are "the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated."  
Weaver
, 450 U.S. at 30, 101 S.Ct. at 965, 67 L.Ed. 2d at 24; accord 
Lynce
, 519 U.S. at __, 117 S.Ct. at 896, 137 L.Ed. 2d at 72; 
Fletcher
, 179 Ill. 2d at 230.  When respondents dropped Eric Morris from that abandoned 14th-floor apartment, they had fair warning that they could be placed on probation for five years and confined against their will.  Where they might be confined, there was no constitutional guarantee.

The Supreme Court has retreated from earlier opinions suggesting that changes affecting punishment automatically fall within the 
ex
 
post
 
facto
 prohibition if they operate to the "disadvantage" of covered offenders.  See 
Morales
, 514 U.S. at 506 n.3, 115 S.Ct. at 1602 n.3, 131 L.Ed. 2d at 595 n.3.  As the Court has clarified, "the focus of the 
ex
 
post
 
facto
 inquiry is not on whether a legislative change produces some ambiguous sort of 'disadvantage,' *** but on whether any such change alters the definition of criminal conduct or increases the penalty by which a crime is punishable."  
Morales
, 514 U.S. at 506 n.3, 115 S.Ct. at 1602 n.3, 131 L.Ed. 2d at 595 n.3; accord 
Fletcher
, 179 Ill. 2d at 234.  Legislative enactments are presumed to be constitutional and all reasonable doubts must be resolved in favor of upholding their validity.  
People v. Davis
, 177 Ill. 2d 495, 501, 687 N.E.2d 24 (1997).  The party challenging a statute bears the burden of clearly establishing the alleged constitutional violation.  
Davis
, 177 Ill. 2d at 501; 
Department of Corrections ex rel. People of State of Ill. v. Adams
, 278 Ill. App. 3d 803, 807, 663 N.E.2d 1145 (1996).  Respondents have not clearly established section 3-10-11, as amended, "increase[d] the punishment for criminal acts."  See 
Collins
, 497 U.S. at 43.

The trial court found the change to section 3-10-11 did not amount to an 
ex
 
post
 
facto
 law because it did not increase the length of the minors' confinement; rather, it simply altered the location of their confinement.  On the facts now before us, we agree.  In fact, when we view respondents' conduct since their findings of delinquency for first degree murder, it is apparent that any placement of these minors would be to a facility providing similar security to that of the JDOC, notwithstanding the goal of rehabilitation with the least restrictive conditions.  However, we do not intimate that every alteration in the location of an individual's confinement, short of those which are imposed with a punitive purpose or which shock the conscience (e.g. 
Medley
), will escape unscathed from 
ex post facto
 scrutiny.  We merely hold that the more burdensome confinement conditions imposed here do not rise to the level of constitutional significance.  

For the foregoing reasons, we affirm the judgment of the trial court.

AFFIRMED.

CAHILL, P.J., and BURKE, J., concur.