PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

RONNELL GRAY KITCHEN,
                *Plaintiff-Appellant,*

v.

DOUGLAS L. UPSHAW, Sargeant;
JANULYN Y. LENNON, Captain;
DARNLEY R. HODGES, SR., Col.;
RIVERSIDE REGIONAL JAIL AUTHORITY,
                *Defendants-Appellees,*

and

THE CITY OF COLONIAL HEIGHTS,
VIRGINIA,
                *Defendant.*

No. 99-2458

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
David G. Lowe, Magistrate Judge.
(CA-99-138)

Argued: September 26, 2000

Decided: April 9, 2002

Before WIDENER, WILLIAMS, and MICHAEL, Circuit Judges.

Affirmed by published opinion. Judge Widener wrote the opinion, in which Judge Williams and Judge Michael concurred.

## COUNSEL

**ARGUED:** Philip Steward Marstiller, PHILIP S. MARSTILLER, P.C., Richmond, Virginia, for Appellant. Fred R. Kozak, BEALE,

BALFOUR, DAVIDSON, ETHERINGTON & PARKER, Richmond, Virginia, for Appellees.

---

**OPINION**

WIDENER, Circuit Judge:

Ronnell Kitchen brought this action under 42 U.S.C. § 1983, alleging that he had a constitutionally protected interest in work release and that officials of the Riverside Regional Jail intentionally violated that interest, causing Kitchen to lose his job. The district court found that the individual defendants enjoyed qualified immunity as individuals and granted summary judgment in their favor on that account. It also granted summary judgment in favor of all defendants on the merits and in their official capacities. Kitchen appeals. We affirm, finding that Kitchen enjoyed no constitutionally protected liberty interest in his work-release determination under Virginia law.

I.

We review de novo a district court's order granting summary judgment and view the facts in the light most favorable to the nonmoving party. See *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). Once the moving party discharges its burden by showing that there is an absence of evidence to support the nonmoving party's case, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. F.R.C.P. 56(c); see *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Summary judgment will be granted unless a jury could return a verdict for the nonmoving party on the evidence presented. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249.

II.

The undisputed facts of this case follow. On July 15, 1997, in the circuit court of Colonial Heights, Virginia, Ronnell Kitchen (Kitchen)

pleaded guilty to the misdemeanor charges of driving under the influence of intoxicants and driving on a suspended license. Kitchen was fined and sentenced to a jail term. The sentencing judge's order also contained the following:

> The Court authorizes that the defendant may participate in a work release program if he is eligible. The defendant must further pay court costs on this charge of $128.00.

Kitchen's brother-in-law, David Resnick, paid in full Kitchen's fines and court costs that same day. Also that same day, Kitchen was committed to the Riverside Regional Jail (Jail).

Sergeant Douglas Upshaw (Upshaw), a defendant in this action, was the work-release coordinator for the Jail. On July 16, Upshaw interviewed Kitchen, and Kitchen signed a "Work and Education Release Program Rules" form. Kitchen also submitted a handwritten statement, explaining that he had a strong desire to participate in the work-release program because he had worked for Allied Signal for twenty-four years, because he had four more years to go until retirement, and because he would be fired if he missed five days of work. On the same day as the interview, Upshaw sent by facsimile to Allied Signal a copy of the "Employer's Community Work Agreement," a form requiring the employer's signature and imposing certain conditions on employers participating in work release.[1] The fax to Allied Signal was marked "Urgent" and "Reply ASAP."

Allied Signal did not respond to Upshaw's fax. On July 17th, Upshaw then telephoned Allied Signal to discuss the company's willingness to participate in the program. Officials at Allied Signal, however, expressed reservations about participating in Kitchen's work release. Allied Signal did not want, for example, law enforcement officials to come onto the work site to monitor Kitchen. Upshaw responded that he would not need to speak with Kitchen at the work site but would only need to see him there, perhaps through a window.

---

[1]Allied Signal, for example, would have been required immediately to inform the Work Release Coordinator of any changes in Kitchen's job status, to submit in advance his weekly work schedule, and to verify the number of hours he actually worked.

Allied officials told Upshaw that they wanted more time to consider the matter and that they would contact him on July 18th with their decision.

Not having heard back from Allied Signal, Upshaw again telephoned the company on Monday, July 21. That call apparently went unreturned. Instead, on July 23, Upshaw received a letter from an official at Allied Signal who said that company policy was not to participate in work-release programs. The letter went on to say that Kitchen was welcome to return to work under the previous conditions of his employment—if he could do so by July 24—but that, in effect, the company would not cooperate with the Jail in supervising Kitchen.

On July 23, pursuant to the Jail's Standard Operating Procedures, known as SOPs, Upshaw sent a letter to the sentencing judge explaining Allied Signal's refusal to participate and reporting that Kitchen was therefore denied work-release privileges. In the letter, Upshaw also asked the sentencing judge whether Kitchen should be granted work release despite Allied Signal's refusal to participate and also apparently enclosed a copy of Allied Signal's letter of July 23. There is no evidence in the record that the judge ever responded to Upshaw's letter. Kitchen did not report for work on July 24.

Finally, following a telephone call from Kitchen's union representative to Superintendent Hodges on July 29, the Jail agreed to waive the requirement that Allied Signal agree to participate in Kitchen's work release. Kitchen was thus granted work-release privileges effective July 30. However, by that time, Allied Signal had discharged Kitchen. On July 30, Captain Janulyn Lennon, Upshaw's supervisor, wrote to Allied Signal saying that in light of Kitchen's long term of employment with the company and short time to go until retirement, the Jail was willing to waive the visitation requirement and the requirement that the employer agree to the terms of the Employer's Community Work Agreement. Captain Lennon's letter also expressed hope Allied Signal would reinstate Kitchen. Allied Signal wrote back on August 1, saying the company had reviewed Kitchen's discharge and had decided not to reinstate him.

III.

At the outset, we should dispose of the Eleventh Amendment defense urged by the Regional Jail Authority.

The Authority argues that it is an arm of the State for purposes of immunity from suit under the Eleventh Amendment. Although the district court expressed no opinion on the question, because the defense may be raised at any time, see *Suarez Corp. Industries v. McGraw*, 125 F.3d 222 (4th Cir. 1992), we address the question. The Eleventh Amendment[2] limits the Article III jurisdiction of the federal courts to hear cases against States and state officers acting in their official capacities. Eleventh Amendment immunity does not extend to mere political subdivisions of a State such as counties or municipalities. *Mt. Healthy City School Dist. Bd. of Education v. Doyle*, 429 U.S. 274, 280 (1977) (citing *Lincoln County v. Luning*, 133 U.S. 529, 530 (1890)). However, the amendment does confer sovereign immunity on an arm of the State. *Mt. Healthy*, 429 U.S. at 280. There is no clear line separating those state instrumentalities that are entitled to sovereign immunity from those that are not, and we follow the Supreme Court's admonition that courts should seek guidance in the twin purposes of the Eleventh Amendment, namely: 1) "the State's fears that 'federal courts would force them to pay their Revolutionary War debts, leading to their financial ruin,'" and 2) "the integrity retained by each State in our federal system." *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 39 (1994). Accordingly, the principal factor to be considered is "whether a judgment against the government entity would have to be paid from the State's treasury." *Cash v. Greenville County Bd. of Education*, 242 F.3d 219, 223 (4th Cir. 2001) (citations omitted). This is often the end of the inquiry, for if the "State treasury will be called upon to pay a judgment against a governmental entity . . . consideration of any other factor becomes

---

[2]The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Although, by its terms, the Eleventh Amendment does not prevent a citizen of a state to sue that state in federal court, it has been construed to bar such suits. See *Hans v. Louisiana*, 134 U.S. 1, 15 (1890).

unnecessary," and the entity will be immune. *Cash*, 242 F.3d at 223. A finding to the contrary weighs against immunity. However, even if the state's treasury will not be used to satisfy a judgment, we still must determine if the relationship of the entity with the state is close enough to implicate the "dignity of the State as a sovereign." 242 F.3d at 224. We apply three additional factors in this determination: 1) the degree of control that the State exercises over the entity; 2) whether the entity deals with local rather than statewide concerns; and 3) "the manner in which State law treats the entity." 242 F.3d at 224 (citations omitted).

We are of opinion that the Regional Jail Authority is not an arm of the State for purposes of Eleventh Amendment immunity. First, and foremost, Virginia's treasury is not implicated here. The statutory scheme that enables municipalities and other political subdivisions to create these regional authorities also confers on the entity the power to sue and be sued in its own name. See Va. Code Ann. § 53.1-95.7(11). There is nothing in this section that indicates that a regional authority acts on behalf of the State when it sues or is sued and thus obliges the State to pay any judgment rendered against the authority. The Authority argues that the State will have to pay any judgment through the operation of the Virginia Constitutional Officer Risk Management plan, an insurance program established by the Commonwealth. However, we have held that an insurance plan such as this does not suffice to extend the protection of sovereign immunity to individuals in the case of a municipal Electoral Board, see *Sales v. Grant*, 224 F.3d 293, 297 (4th Cir. 2000), and we are of opinion this principle should also apply to another local governmental entity, the Regional Jail Authority. Cf. *Regents of the University of California v. Doe*, 519 U.S. 425, 431 (1997) ("it is the entity's potential legal liability, rather than its ability or inability to require a third party to reimburse it, or to discharge the liability in the first instance, that is relevant . . .").

None of the other factors militate towards a finding that the Authority is an arm of the State. First, the state law scheme does not appear to treat the Authority as an arm of the State. The Authority exercises substantial control over its own operations including appointing necessary jail officers, agents and employees, and fixing their compensation. Va. Code Ann. § 53.1-95.7(3). Additionally, the

participating political subdivisions must pay their share, from their treasuries, of the costs for land, stock, equipment, and structures. Va. Code Ann. § 53.1-106(B). Furthermore, the governing body of the Authority is appointed by the governing bodies of the participating local political subdivisions, not the Commonwealth. Va. Code Ann. § 53.1-106(A). While it is true that the State pays two-thirds of the superintendent's and approved medical treatment personnel's salary, Va. Code Ann. § 53.1-115, we think that this fact alone does not forge the close link between the Authority and the State requisite to implicate the State's dignity as a sovereign and thus entitle the Authority to sovereign immunity. To the contrary, the retention of substantial authority and control over the construction, governance, and operation of the regional authority, as well as the liability for most of the costs and expenses, tends to establish that the Authority is an arm of the participating local political subdivisions. Finally, the statutory scheme, by its own terms, provides a mechanism by which municipalities may combine to solve local or regional jailing problems, not statewide ones. Of equally great importance, we think it clear that logic requires that two or more political subdivisions, as here, neither of which is entitled to sovereign immunity, may not, without more, combine to create an agency that is entitled to sovereign immunity. Accordingly, we are of opinion that the Regional Authority is not entitled to sovereign immunity under the Eleventh Amendment.

IV.

Although the Fourteenth Amendment prohibits a State from depriving an inmate of liberty without due process of law, when a defendant is lawfully convicted and confined to jail, he loses a significant interest in his liberty for the period of his sentence. See *Gaston v. Taylor*, 946 F.2d 340, 343 (4th Cir. 1991) (en banc). Additionally, a prisoner's confinement is of necessity subject to the broad discretion of those managing the jail. See *Gaston*, 946 F.2d at 343. Nonetheless, confinement does not strip an inmate of all liberty interests. See *Gaston*, 946 F.2d at 343.

Kitchen alleges that, for several days, the jail officials unconstitutionally prevented him from participating in work release. To prevail in his § 1983 action for deprivation of a liberty interest, Kitchen first would have to demonstrate that prisoners enjoy a protected liberty

interest in work release under Virginia law. See *Beverati v. Smith*, 120 F.3d 500, 502 (4th Cir. 1997).

We employ the standard set forth in *Sandin v. Conner*, 515 U.S. 472, 484 (1995), to determine whether state law creates a liberty interest that affords prisoners due process protection. In *Sandin*, the Court reconsidered its reasoning in previous cases, particularly *Hewitt v. Helms*, 459 U.S. 460 (1983), in which the recognition of a liberty interest turned on whether the statute or regulation at issue used mandatory or discretionary language.[3] *Sandin*, 515 U.S. at 480. Such inquiries, said the Court, discourage state officials from codifying their administrative procedures and inappropriately involve federal courts in managing prisons. *Sandin*, 515 U.S. at 482. Instead, the Court concluded that States may still create liberty interests that afford prisoners due process protections, but explained:

> [T]hese interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . ., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

515 U.S. at 484. (internal citations omitted). Applying this standard, the Court in *Sandin* held that an internal prison disciplinary sentence of a prisoner to 30 days in segregated confinement did not present the type of "atypical, significant deprivation" in which a State might create a liberty interest. *Sandin*, 515 U.S. at 486.

Kitchen does not contend that the temporary withholding of permission to participate in work release gives rise to the protection of the Due Process Clause by its own force. Thus, the question is

---

[3]In *Hewitt*, for example, the Court found that Pennsylvania had gone beyond promulgating simple procedural guidelines. Instead, it had used "language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed" in administrative segregation determinations. *Hewitt*, 459 U.S. at 472. Such language, said the Court, "demands a conclusion that the State has created a protected liberty interest." *Hewitt*, 459 U.S. at 472.

whether denial of work-release status imposed on Kitchen an "atypical and significant hardship in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484.

Two cases from our sister circuits have, under *Sandin*, rejected the contention that once an inmate has been given work release he thereby acquires a liberty interest in retaining that status. In *Dominique v. Weld*, 73 F.3d 1156 (1st Cir. 1996), an inmate was, for various penalogical reasons, summarily removed from a work-release program and sent to a medium security prison after having successfully participated in work release for four years. The First Circuit held that because confinement within the prison walls of the medium security prison was an ordinary incident of prison life, the prisoner did not enjoy a constitutionally protected liberty interest in work release. See *Dominique*, 73 F.3d at 1160. Likewise, in *Callender v. Sioux City Residential Treatment Facility*, 88 F.3d 666 (8th Cir. 1996), the inmate's work-release status was revoked when he refused to admit his crime, a condition of maintaining work-release status. Reasoning that the inmate was returned to the same facility from which he had left upon being granted work release several months before, the court found revocation of his work-release status imposed neither an atypical nor a significant deprivation. See *Callender*, 88 F.3d at 669.

Kitchen, in the case at hand, was not removed from a work-release program; he was merely denied permission to participate in one. Thus, Kitchen essentially claims he suffered a constitutionally significant deprivation in not being granted work release by the jail officials who were authorized by statute and by court order to determine whether he was eligible for such a program. We take judicial notice of the fact that there is nothing atypical about prisoners being denied permission to leave jail in order to work. Thus, we hold that under Virginia law prisoners have no constitutionally protected liberty interest in work release.

Neither side has depended on *Sandin*; instead, they apparently assume that the type of inquiry rejected in *Sandin* would be controlling here. However, even under a pre-*Sandin* analysis we find that Virginia law has not created a constitutionally protected liberty interest in initial work-release determinations.

Using that analysis, we have previously held that prisoners do not enjoy a liberty interest in work release under Virginia law. See *Gaston v. Taylor*, 946 F.2d 340, 344 (4th Cir. 1991) (en banc). In *Gaston*, we examined Virginia's work-release statute and found that instead of creating an entitlement, Va. Code Ann. § 53.1-60(A) gives the Director of the Department of Corrections discretion to approve inmates for the program. See *Gaston*, 946 F.2d at 344.

Kitchen attempts to distinguish *Gaston* by pointing out that the sentencing judge in this case authorized Kitchen's work release under Va. Code Ann. § 53.1-131(A), a section not construed in *Gaston*. In effect, he argues that, under § 53.1-131(A), once a court orders that an inmate may participate, jail officials are unable then to deny the inmate permission to be released for work. Kitchen also argues that the sentencing judge's order itself employed mandatory language which removed all discretion from jail officials once Kitchen paid his court costs and fines, and that jail officials "willfully and deliberately" violated that court order.

Under § 53.1-131(A), a court may, "if it appears to the court that [an] offender is a suitable candidate for work release, assign the offender to a work release program under the supervision of . . . the administrator of a local or regional jail . . . ." We note, however, that § 53.1-131(A) also states that "[t]he Board [of Corrections] shall prescribe regulations to govern the work release . . . programs authorized by this section." Thus, under a pre-*Sandin* analysis, § 53.1-131(A) would not have required that we change the view expressed in *Gaston* that inmates have no liberty interest in the initial work-release determination.

Furthermore, it is not the case that, as Kitchen argues, the sentencing judge in his case "specifically authorized work release for Kitchen upon payments of the fines and court costs." To support his claim that payment of fines and costs was the only prerequisite for an entitlement to work release, Kitchen cites to a disposition notice apparently issued by the circuit court clerk's office. The handwritten notation to which Kitchen refers says that costs must be paid in full "for work release eligibility." It may be unclear whether the clerk indicated payment of costs was a sufficient condition or was instead merely a necessary condition for Kitchen's work release. However, what the clerk

indicated on the disposition notice is irrelevant here. It is well established that Virginia trial courts speak only through their written orders. See *Fredericksburg Const. Co. v. J.W. Wyne Excavating, Inc.*, 530 S.E.2d 148, 152 (Va. 2000). In this case, after fining Kitchen and sentencing him to a term in jail, the court's order read as follows:

> The Court authorizes that the defendant *may* participate in a work release program *if he is eligible*. The defendant must further pay court costs on this charge of $128.00. (emphasis added).

Thus, even if payment was a condition of work release, the plain language of the court's order did not make payment of costs and fines the only condition for work release. Instead, the court's order obviously contemplated Jail officials would make an independent determination of Kitchen's eligibility.

Kitchen also seems to argue that he met all of the Jail's eligibility requirements for work release and that he therefore was entitled to work release. However, under a pre-*Sandin* analysis, it would be irrelevant were Kitchen to have met all of the eligibility criteria used to pre-screen inmates. This is so because the Jail's SOPs state that "if it is determined that an individual is eligible for work release, he/she *may* be placed in the program" (emphasis added). This is not the kind of mandatory language identified as dispositive in *Hewitt*. Additionally, the SOPs make it a requirement of the eligibility investigation that "the employer must sign and return the [Employer's Community Work Agreement] form to the Coordinator."[4] Allied Signal declined to sign the form, and jail officials, in compliance with their SOPs, therefore identified Kitchen as ineligible for work release.

---

[4] We note that the Jail's SOPs also provide that when the jail finds an inmate ineligible for work release, a letter of explanation will be submitted to the sentencing judge who ordered work release. The sentencing judge then may subsequently order that the inmate be placed on work release irrespective of the Jail's determination of ineligibility. Upshaw did notify the sentencing judge of Kitchen's ineligibility for work release, citing Allied Signal's refusal to cooperate. There is no indication that the sentencing judge saw fit to order Kitchen be granted work release despite the Jail's finding of ineligibility.

Finally, because the SOPs, in certain instances, provide for "due process" hearings before an inmate is removed from work release for violation of rules, Kitchen argues that those same protections therefore attach to the initial determination of work-release eligibility. Although we need not and do not decide whether, under Virginia law, a protected liberty interest attaches once an inmate is granted work-release status, even the pre-*Sandin* analysis recognized "the crucial distinction between being deprived of a liberty one has . . . and being denied the conditional liberty that one desires." *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex*, 442 U.S. 1, 9 (1979) (rejecting such an argument in context of parole determinations).

Thus, even by engaging in the pre-*Sandin* analysis Kitchen urges on us, he still fails to show any evidence that the jail officials' discretion was limited by the court's order or the statutes and regulations at issue in this case.

## V.

Finally, *Sandin* clearly mandates that we find prisoners enjoy a protected liberty interest only when an inmate can demonstrate he suffered an "atypical and significant hardship in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. Although the court is not unsympathetic to Mr. Kitchen's loss of employment, it is clear that being denied permission to leave jail in order to work is nothing more than an ordinary experience of inmates. Therefore, we hold Kitchen enjoyed no constitutionally protected liberty interest in work release.

## VI.

The district court held that the individual defendants as individuals were each protected by qualified immunity and, as well, granted summary judgment to the individual defendants in their official capacities. It also granted summary judgment to the Regional Jail Authority.

As we have just explained, there is no merit to the claim that the plaintiff had a Constitutionally protected liberty interest in the work

release program. That being true, the order of the district court granting qualified immunity to the individual defendants as individuals is likewise correct. *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir. 1991) (holding that such a deprivation of a Constitutional right must be clearly established which, of course, it was not here, being non-existent).

The judgment of the district court is accordingly

*AFFIRMED.*[5]

---

[5]The City of Colonial Heights was a party to the complaint but was dismissed from the case on May 26, 1999. Exception is not taken on appeal to that order.