FLOYD, Circuit Judge,
concurring in part and dissenting in part:
I join the majority’s well-reasoned opinion in its entirety except as to the three paragraphs of Part II.B pertaining to *727 Blaine’s potential liability as a direct discriminatory actor. For the reasons that follow, I respectfully dissent on this issue and would remand the case for trial, or at a minimum, for additional briefing at the summary judgment stage.
As best I can glean from the record, Wasson is an individual who wears multiple hats: he is both the President of Dan-ville Housing Corporation (DHC), Blaine’s managing member, and Executive Director of the Housing Authority. Despite these separate corporate designations, Wasson works out of the same office (e.g., same physical address, same telephone number, etc.) when he acts on behalf of both DHC and the Housing Authority. As Blaine’s managing member, DHC — and thus impliedly Wasson, in his role as DHC’s President — “ha[s] full, exclusive and complete charge of the management of the business of [Blaine]” pursuant to Blaine’s amended 2008 Operating Agreement. (J.A. 2445.) Additionally, it is undisputed that the Housing Authority’s Board of Commissioners is identical to DHC’s Board of Directors. In sum, the upper-level management personnel who wield decision-making power for both the Housing Authority and Blaine (by way of DHC) appear to be concentric, or at a minimum exhibit a substantial overlap.
As the majority opinion correctly notes, Blaine provides funding to the Housing Authority for the Project, and the Housing Authority, in turn, distributes those funds to the project contractors, including Car-nell. Accordingly, pursuant to Blaine’s organizational structure and DHC’s ability to act unilaterally on Blaine’s behalf,[1] distri-button of funds to the Housing Authority is essentially controlled by DHC. Thus, even discounting in their entireties the letters that Wasson (allegedly erroneously) signed as Blaine’s President, see ante at 717 n. 6, Wasson appears to nevertheless control Blaine’s (and thus the Housing Authority’s, and thus Carnell’s) purse strings in a backdoor fashion. To wit, in his dual roles as Executive Director of the Housing Authority and as President of DHC, Wasson is both puppet and puppeteer of the funding operation for the project.
Based on the aforementioned relationships, Blaine may be liable pursuant to a theory similar to (although perhaps not exactly the same as) “cat’s paw” (or “rubber-stamp”) liability, which “impostes] liability upon an employer for the discriminatory motivations of a supervisor, even though the supervisor did not formally take the adverse employment action.” Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 288 (4th Cir.2004); see Smith v. Bray, 681 F.3d 888, 897 n. 3 (7th Cir.2012) (“In the law of employment discrimination, the ‘cat’s paw’ theory can apply when a biased subordinate who lacks decision-making power uses the formal decision-maker as a dupe in a deliberate scheme to trigger a discriminatory employment action.” (citation omitted) (internal quotation marks omitted)). Here, the cast of characters is as follows: Blaine (via DHC, and ultimately, Wasson) as the biased shell entity that lacks decision-making power to distribute funds to the project contractors, and the Housing Authority as the duped formal decision-maker that took the adverse employment actions (at least on paper) at Blaine’s behest. Al *728 though Carnell did not advance this precise theory relating to Blaine’s liability for direct discrimination, Carnell did put all of the pieces in place to connect these dots— namely, the massive overlap between Housing Authority personnel and DHC personnel and the fact that Wasson holds positions of authority within each entity. For example, in arguing that Blaine should be held directly liable, Carnell asserted that “money [for the project] was funneled through [the Housing Authority], but the funds originated with Blaine.” (Carnell Reply Br. at 29.).
In my view, we do not know from the record exactly which entity — the Housing Authority or Blaine (by way of DHC)— Wasson was acting on behalf of when he took certain actions adverse to Carnell, and it is simply too easy for Blaine to look the other direction and to rely exclusively upon Wasson’s self-serving deposition testimony that he was acting on behalf of the Housing Authority “at all times.”[2] (E.g., Appellees’ Opening Br. at 32.) As the nonmovant in the summary judgment proceedings, it is not Carnell’s burden to show that Blaine acted in a discriminatory manner and, based on the foregoing relationships, I do not think that Blaine has met its own burden of “showing that there is an absence of evidence to support [Car-nell]’s case.” Kitchen v. Upshaw, 286 F.3d 179, 181 (4th Cir.2002) (explaining the burden-shifting framework at summary judgment). To the same extent that we hold in this opinion that Carnell has an imputed racial identity (and thus standing to sue) based upon its president and members, it follows that a defendant company can likewise maintain an imputed racial bias based upon its membership. Although this analysis requires us to peel back an additional layer off of the Blaine onion than off of the Carnell onion — i.e., because Blaine has no individual employees or officers, we must instead look to the individual employees of Blaine’s managing member — all roads ultimately lead back to the same individuals, and particularly Gary Wasson.
Although I do not think that there is sufficient evidence before us to reverse the district court’s grant of summary judgment to Blaine, I do think that the blurriness of Wasson’s multiple roles (and the overlap of other individuals, as well, namely the members of DHC’s Board and the Housing Authority’s Board, respectively) is an issue for a jury to consider at trial, or an issue that, at the least, warrants additional briefing and consideration at the summary judgment stage. Accordingly, I would vacate the district court’s grant of summary judgment to Blaine on Carnell’s theory of direct liability and respectfully dissent from the majority’s holding pertaining to the same.

. Blaine’s amended Operating Agreement provides as follows:
[T]he Managing Member [DHC] is fully authorized, without the requirement of any act or signature of the other Members, to take any action of any type and to do anything and everything which a managing member of a limited liability company organized under the Uniform [Limited Liability Company] Act may be authorized to take or do thereunder....”
(J.A. 2449 (emphasis added).)

. Appellees, in their recitation of the facts in their Opening/Response brief, state the following:
Under Section 14.2 of the Operating Agreement, Blaine's members granted a limited power of attorney to the president of its managing member, DHC, to sign the Operating Agreement and certain other legal documents. Pursuant to the limited authority granted by the power of attorney, DHC's president, Garry [sic] Wasson signed the Operating Agreement. The Operating Agreement also contemplated [the Housing Authority]’s involvement in the Project as the developer, and so Wasson signed on behalf of [the Housing Authority] as its Executive Director.
(Appellees’ Opening Br. at 7 (emphasis added).) These actions by Wasson, although facially insignificant, are exemplary of Wasson taking off his DHC (i.e., Blaine) hat and putting on his Housing Authority hat with little to no appreciation for the distinction between his dual roles at each entity.